[L. A. No. 25406.   In Bank.   June 19, 1959.]

In re OLIVER O. CLARK, on Suspension of License.

Morris Lavine for Petitioner.

Garrett H. Elmore and Willis E. Urick, Jr., for Respondent.

THE COURT.—On May 22, 1956, Oliver O. Clark, an attorney at law, was charged by information with eight counts of grand theft and five counts of selling securities of the United States Onyx Corporation (hereafter referred to as "Onyx Corporation") without first obtaining a permit from the California Commissioner of Corporations. The jury found defendant guilty on all 13 counts. Defendant's motion for a new trial was granted. Before the retrial, Clark changed his plea and pleaded guilty to two charges of violating section 26104, subdivision (a) of the Corporations Code by knowingly

selling stock of Onyx Corporation without a permit to Fred Jacobsen on November 23, 1954, and to Eugene F. Lombardo on December 18, 1954. Proceedings were suspended on these two counts and defendant was granted probation for five years upon the conditions that he make restitution to those persons who wished to have their money returned and that he not engage in any form of illegal activities. The remaining eleven counts of the information were dismissed.

Clark's plea of guilty constitutes a "conviction." (Bus. & Prof. Code, § 6101, as amended Stats. 1955, ch. 1190, p. 2201, § 1.) A report of the conviction was filed with this court, and on July 8, 1957, we referred the matter to the Board of Governors of the State Bar of California for hearing and report on the question whether the offenses involved moral turpitude and for recommendation as to the discipline, if any, to be imposed.

Although violations of the Corporate Securities Act are essentially *malum prohibitum* rather than *malum in se,* it does not follow that they may not involve moral turpitude. If they are not merely technical, but are accompanied by an intent to evade the act with the object of gain or profit, they involve moral turpitude. (*In re Hatch,* 10 Cal.2d 147, 152 [73 P.2d 885] ; see also *In re Hallinan,* 43 Cal.2d 243, 246-248 [272 P.2d 768].)

Hearings were held before a Special Administrative Committee of the State Bar. The Board of Governors adopted the findings of the committee and concluded that Clark ". . . intentionally violated and evaded the Corporate Securities Act of California with the object of personal gain," and that "The facts and circumstances surrounding the commission of the offenses to which respondent pleaded guilty . . . involved moral turpitude." The committee recommended that Clark be disbarred. The board recommends that he be suspended for a period of three years.

The board took account of Clark's past record in recommending the discipline to be imposed. Clark was admitted to practice in this state in 1907. In 1949 the board publicly reproved him for obtaining $1,000 from a client upon the false representation that he had filed a complaint for the client. In 1952 he was suspended for six months for gross negligence in the handling of funds as a guardian and for filing misleading accounts with the probate court. (*Clark* v. *State Bar,* 39 Cal.2d 161 [246 P.2d 1].) He is a skilled practitioner and must be deemed to have been aware of the requirements

of the Corporate Securities Act. He has organized a number of corporations in the past and in so doing has applied to and obtained from the California Commissioner of Corporations the necessary permits for the issuance of securities.

In 1952, primarily through Clark's promotional activities, Onyx Corporation was organized under the laws of the State of Nevada. Since that time he has been a director of the corporation and has been its president for most of this period, as well as its principal attorney and manager. After the incorporation in Nevada, promoters of the corporation caused to be transferred to it leasehold interests in deposit of onyx, scortia, and marble in Arizona and Nevada. The proposed operations of the corporation included the exploitation of these deposits, transshipping the stone to a processing plant near Los Angeles, and marketing the finished products as building materials. Clark evaluated the potential value of the leasehold interests as in excess of $500,000. Despite the expectations of the promoters and the investment of considerable sums by various persons, the corporation did not commence operations and is insolvent.

The articles of incorporation provide for three classes of stock: common stock in an authorized amount of 25,000 shares without par value; Class A preferred stock in an authorized amount of 150,000 shares with a par value of $1.00 per share, and Class B preferred stock in an authorized amount of 70,000 shares with a par value of $1.00 per share. Purchasers of Class A preferred stock are entitled to receive certificates for common stock, without additional consideration being paid, at a rate of 75 shares for each 1,000 shares of Class A stock purchased. The entire block of 70,000 shares of Class B stock was issued to the corporation's predecessor in interest in the deposits in consideration for the transfer of these interests. The sales of stock hereafter referred to are sales of Class A preferred stock.

When Onyx Corporation was incorporated, it issued 3,750 shares of common stock to Clark's wife in consideration of Clark's promotional services and authorized 1,666⅔ shares of Class A stock to be issued to her for $1.00 per share. The corporate records indicate that no other shares were issued by the corporation to Clark or his wife before the sales of stock to Jacobsen and Lombardo.

Clark maintains that the stock that he sold to Jacobsen and Lombardo was his personally owned stock and that therefore no permit was required. This claim is based on the

alleged existence of a "pool" of subscribed for, but unissued, stock that Clark maintains he owned and upon which he periodically drew in selling Onyx Corporation stock to various investors, including Jacobsen and Lombardo. The board made extensive findings of fact to the effect that Clark's offers to subscribe to certain amounts of stock, if they actually had been made, had never been accepted by any valid action of the corporation's board of directors, and that consequently no such "pool" of unissued stock was controlled or owned by Clark. These findings are not necessary to refute Clark's contention that no permit was needed for the sales in question. In these proceedings Clark is precluded from questioning his guilt of knowingly selling securities without a permit, since the record of his conviction for this offense is conclusive on the question. (*In re Hatch*, 10 Cal.2d 147, 150 [73 P.2d 885]; Bus. & Prof. Code, § 6101.)

The following facts amply support the board's conclusion that Clark's conduct involved moral turpitude. In May 1953 he obtained a "loan" of $27,000 from a Mr. Barker and a Mr. Futernick. These funds were apparently expended by him for corporate purposes. The corporation's minute book states that on May 23, 1953, at a meeting of the board of directors, Clark stated that the corporation was indebted to him, on his open account, for sums in excess of $32,500 and that he therefore tendered his subscription for preferred stock in this amount, to be paid for by an immediate debit to his account. The oral subscription was purportedly accepted by the board, and a certificate for 27,000 shares, with a par value of $27,000, was issued to Mr. Nat C. Recht, as trustee for Barker and Futernick, to "secure the indebtedness."

In June 1953 Clark obtained, in California, "loans" of $12,500 in the "Snyder-Stanton transaction." This money was apparently expended by Clark for corporate purposes. The minute book states that on July 15, 1953, Clark announced to the board of directors that the corporation was indebted to him on his open account for more than $14,000 for moneys advanced by him to the corporation, and that he tendered his subscription for 14,000 shares of Class A stock to be issued upon his request and to be paid for by an immediate debit to his account. Following the meeting, certificates for 12,500 shares of Class A stock were issued on Clark's instructions to Snyder and Stanton.

At meetings of the board of directors on September 21,

1954 and November 15, 1954, Clark stated that the corporation was indebted to him in excess of $3,500 on his open account. At each meeting his oral subscription for 3,500 shares was purportedly tendered and accepted, the certificates to be issued on his request. Clark admits that at the time there was no actual written account of the amounts expended, and that the figures were carried in his head. He does not have cancelled checks, receipts, or vouchers evidencing more than a fraction of the claimed advances.

In September 1954, using his stationery as an attorney in Los Angeles, Clark offered Mr. Ray Myers, president of a Los Angeles construction firm, 25,000 shares of Class A stock in exchange for the construction of a $25,000 marble processing plant in Cucamonga, California. On September 23, 1954, a certificate for 25,000 shares of stock was issued in Myers' name "in pledge" to secure the corporation's promissory note for $25,000.

In November and December of 1954 Clark received a total of $10,000 ($2,500 on November 23; $500 on December 2; $5,000 on December 7; and $2,000 on December 15) from Jacobsen, and $2,000 from Lombardo, for the purchase of Class A stock. At different times after the first purchase by Jacobsen, Clark obtained the following sums for stock purchases from persons in California: Mr. Cherry, $1,000; Mrs. Munson, $2,000; Mr. Hennessy and Mr. Ball, $2,500; Mr. Heller, $1,000; Betty M. Langley, $1,250; Mr. Cuddleback, $1,250; Mr. Leslie, $10,000; and Mr. Ohmer, $500. The minutes of a directors' meeting of January 28, 1955, state: "Mr. Clark stated that he had advanced to and for this corporation as loans to it moneys aggregating $9,500.00 as follows, to wit: $500.00 on or about December 2, 1954; $2,500.00 on or about December 7, 1954; $2,000.00 on or about December 15, 1954; $4,500.00 on or about December 20, 1954." The minutes state that Clark's subscription for 10,000 shares was tendered and accepted, to be paid for by an immediate debit to his open account. Clark identifies these amounts as representing the money expended for corporate purposes that had been received by stock sales to Mrs. Munson, Mr. Ohmer, Mr. Lombardo, and half of the money received from Mr. Jacobsen ($5,000 of Jacobsen's investment was paid on account of Clark's Barker-Futernick loan). The minutes for March 11, 1955 show a tender and acceptance of a subscription for 14,500 shares, made in the same manner. Clark admits that the receipts from the 10,000 share sale to Leslie,

the 1,000 share sale to Cherry, and the 2,500 share sale to Hennessy and Ball "constitute a portion of the $14,500.00 which at that [March 11th] meeting I stated to the Board of Directors was then owing to me by the corporation for moneys theretofore advanced by me to it."

The inference is plain that the sales to Jacobsen and Lombardo were not sales of Clark's personally owned stock, but were merely part of a series of sales in a scheme to sell Onyx Corporation securities without complying with the Corporate Securities Act. Clark admits that Onyx Corporation was incorporated in Nevada partly for the purpose of avoiding the necessity of securing the approval of the California Commissioner of Corporations for the issuance of its securities. It is apparent that Clark also attempted to avoid the necessity of securing a permit by a plan to receive money for stock, use it for corporate purposes, and then, on the basis of a purported loan to the corporation, to have alleged "personal" stock issued to fulfill his obligations to the investors. In *People* v. *Ratliff*, 131 Cal.App. 763, 771-772 [22 P.2d 245], a similar scheme for financing a corporation was held to violate the Corporate Securities Act. As a stockholder and creditor of an insolvent corporation Clark stood to gain personally from the receipt of additional funds by the corporation. The board's conclusion that Clark's conduct involved moral turpitude in that he "intentionally violated and evaded the . . . [act] with the object of personal gain" finds ample support in the record, and it is therefore unnecessary to consider his contention that the evidence does not support the board's findings that he misrepresented and concealed material facts in connection with the sales to Jacobsen and Lombardo.

■ Clark contends that the trial judge who heard the testimony regarding the commission of the offenses at the trial in the superior court was in the best position to judge whether or not moral turpitude was involved in Clark's conduct, and that his determination not to fine or imprison Clark amounts to a finding that there was no moral turpitude. Since the question whether an attorney should be disciplined for an act involving moral turpitude was not before the trial court, the granting of probation upon Clark's pleas of guilty cannot be regarded as a finding on that question. ■ "Whether petitioner was convicted of a crime involving moral turpitude or of one not involving moral turpitude was a question of law and not one of fact, and the prerogative to decide that

question of law is with this court, upon the transmission to this court of the certified copy of the record of conviction by the clerk of the trial court, and not with the trial court.'' (*In re McAllister*, 14 Cal.2d 602, 604 [95 P.2d 932].)

Counsel for Clark urges that in view of his advanced age of 73 years, a suspension for three years is equivalent to disbarment and is therefore excessive. In considering the discipline to be imposed we cannot overlook Clark's past record and his apparent disinclination to mend his ways to avoid again becoming subject to disciplinary action. Twice before leniency has been extended him, yet the record is replete with evidence that he has continued to take ''short-cuts'' in carrying out the responsibilities he has assumed in connection with handling of funds of others, e.g., his diversion of at least $2,500 of Jacobsen's investment from the represented purpose of putting the processing plant in operation to a payment on account of his loan from Barker and Futernick; his failure to maintain any written account of the moneys received from investors and allegedly expended by him for corporate purposes; his failure to cause the corporation to maintain a stock ledger or any account that accurately identifies the stockholders or their holdings; his practice of causing to be drawn up in advance the minutes of directors' meetings at which his subscriptions for shares of stock were purportedly accepted, and his apparent reconstruction of the minutes of certain of these meetings after the criminal charges had been filed against him; his dealings in cashiers' checks, telegraphic money orders, and cash which, along with the nonmaintenance of even a personal bank account, makes impossible an accurate reconstruction of his handling of investors' and the corporation's funds; and his causing certain certificates of stock to be antedated or issued out of order in violation of the articles of incorporation.

It is ordered that Oliver O. Clark be suspended from the practice of law for a period of three years, commencing 30 days after the filing of this opinion.