[L. A. No. 28598.   In Bank.   Apr. 26, 1966.]

In re EDGAR G. LANGFORD on Suspension of License.

490

Thomas Whelan, J. Robert O'Connor, James M. Lane and J. Perry Langford for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—Petitioner, a member in good standing of the State Bar since his admission in 1927, pleaded guilty to and was convicted of selling securities without a permit in violation of subdivision (a) of section 26104 of the code. He was sentenced to imprisonment in the county jail for one year, probation was granted, the terms of probation have been fulfilled and the probationary period has expired.

The questions whether the crime of which petitioner was convicted, or the circumstances of its commission, involved moral turpitude were referred by this court to the State Bar. (Bus. & Prof. Code, § 6102.) Following a hearing before a

local administrative committee, which recommended suspension for three years, the Board of Governors of the State Bar found that petitioner had made fraudulent representations in connection with the commission of the crime and that such conduct involved moral turpitude. It recommends that we suspend petitioner from the practice of law for the period of one year.

Petitioner, who at the times here involved was 59 years of age, has practiced law continuously in the City of San Diego for a period of 30 years. He specializes in defending persons charged with crimes, and during the course of his professional career has defended in criminal cases involving fraud by trick or device, in "pigeon drop" and in bunco cases including fixed horse races, card and dice games. Petitioner has also defended a client against charges of violations of the Corporate Securities Act by the selling of undivided interests in patents. As will be seen the crime of which petitioner was convicted involved similar charges.

Roy L. Snavely, petitioner's codefendant in the criminal proceedings, had been a client of petitioner since 1950. Petitioner defended him against charges of issuing bad checks and failure to provide support, and had represented him as a judgment debtor in civil proceedings in 1960. As a result of this latter representation petitioner became familiar with an interest which Snavely claimed as an inventor in a baby crib-playpen device known as the "Karry Krib." The crib was then being manufactured by a corporation which experienced financial difficulties, and shortly thereafter ceased production. As an officer of the company Snavely had guaranteed certain of its obligations and became personally liable therefor. The firm evidently had no exclusive right to the crib and petitioner informally agreed to represent Snavely in further attempts to exploit the device.

After an unsuccessful attempt to refinance the existing operation for production of the crib, Snavely, on December 6, 1960, with petitioner's assistance, executed an assignment of all of his interest in the crib to one Jack Kaufman. This assignment was made only as a convenience to the parties concerned in forestalling Snavely's creditors, and Kaufman was to obtain only legal title without the full equitable interest. Thereafter on December 9, 1960, Kaufman and the American Marketing Associates, Inc., entered into an agreement for the manufacture and sale of the crib. Petitioner was present at discussions leading up to the agreement. He did not consider the Snavely-Kaufman assignment to be a transfer in fraud of

creditors because "it had no value per se . . . the patent hadn't been issued."

The American Marketing Associates, Inc., was required under the agreement to manufacture, market and sell in good faith, but was not required to actually manufacture or sell any specific number of cribs. The agreement provided for a $1.00 royalty to be paid to Kaufman on each of the first 50,000 cribs sold. The understanding between Kaufman, Snavely and petitioner was that 10¢ of each $1.00 royalty was to go to each of them, 40¢ to Snavely's creditors, and the remaining 30¢ to other persons. On December 12, 1960, petitioner prepared and Kaufman executed two 5¢ royalty assignments to Snavely. The first royalty payment under the contract was due April 20, 1961.

On or about December 12, 1960, petitioner and Snavely first visited Jane V. Scarpitti at her home in connection with the sale of a royalty interest in the contract with the American Marketing Associates, Inc. After discussions that evening and, according to Mrs. Scarpitti the following evening, petitioner drew an instrument by which Snavely assigned one of his 5¢ royalties to Mr. and Mrs. Scarpitti. Petitioner's conviction is predicated upon his participation in the issuance of the instrument representing this 5¢ royalty.

There is some conflict in the record as to the time and nature of discussions which were had between petitioner and Snavely, on the one hand, and Mrs. Scarpitti on the other. It substantially appears, however, that the American Marketing Associates, Inc., contract was exhibited and read to her; that petitioner attempted to sell her a 5¢ royalty for $1,500, which he represented to be worth from $1,500 to $2,500; that he told her "the royalties were worth one thousand dollars a penny but because his client was pressed for money he was offering it to . . . [her] very reasonably at five hundred dollars a penny"; that he represented "there would be on the market many cribs by the following month, the middle of the month, which would have been January, 1961," and she "should start to receive her first royalty check the end of March or the first week in April"; that there were then in a factory some 2,400 cribs in the process of manufacture. Petitioner did not explain to Mrs. Scarpitti that the American Marketing Associates, Inc., was not firmly committed to produce the crib "Because it never occurred to [him] that any such thing was at all likely to occur."

Between the dates of December 15, 1960, and January 3,

1961, Mrs. Scarpitti paid Snavely approximately $6,100, transferred to him her title to a used truck, and delivered to him a chinchilla fur stole and 78 chinchilla fur pelts, in payment for assignments of royalty interest which brought her total royalty holdings under the American Marketing Associates, Inc., contract to 50¢ of each royalty dollar. While petitioner did not directly participate in these transactions Mrs. Scarpitti testified that he nevertheless assured her at a later date that "you will get your fifty cents royalties just as soon as we find someone to manufacture and market these cribs."

The American Marketing Associates, Inc., contract was abandoned without the payment of any royalties or the manufacture of any cribs.

In April, when it became apparent that Mrs. Scarpitti's investments were not wisely made, petitioner and Snavely came to her home to discuss the matter. Petitioner told her about an opportunity to recoup her losses in a Mexican gold importing venture, and advised her that he had investigated the law and procedures relating to the importation of gold, and had arranged for the testing of samples. The plan was to purchase gold from Indians in Mexico for $20 an ounce and sell it to the United States Government for $35 an ounce. Petitioner represented to Mrs. Scarpitti that $1,500 was initially required as "front money" to finance a trip to Chicago by Snavely, so that he could make arrangements with the major investors. She advanced the $1,500 and received a written, personal guarantee from petitioner.

Later in April Mrs. Scarpitti withdrew $8,000 from an account and she, Snavely and others went to Calexico for the purpose of purchasing a gold brick. During some transactions at the border Mrs. Scarpitti's funds disappeared after changing hands several times but never reaching those of the prospective seller.

On still a later occasion petitioner again contacted Mrs. Scarpitti and advised her that sellers in Mexico were ready to proceed, thus affording her an opportunity to recoup her first gold transaction loss. On this occasion she, petitioner and Snavely went to Tijuana and she purchased for $3,000 what was represented by a Mexican to be a gold ingot. The ingot turned out to be of some other metal.

The foregoing accounts of the crib and gold transactions are disputed by petitioner in material respects. While it is true that some of Mrs. Scarpitti's testimony before the local administrative committee is conflicting, it nevertheless is of sufficient substantial character that findings based thereon

must be deemed to be properly grounded. Significantly, the board found, in connection with the crib transaction: "At that time [petitioner] told Mrs. Scarpitti that there would be many cribs on the market 'by the following month' and that Mrs. Scarpitti would receive her first royalty check at the end of March or the first week in April 1961; he represented to Mrs. Scarpitti that such royalty interest was worth one thousand dollars a penny or five thousand dollars, and that it was being offered to Mrs. Scarpitti below its actual value because his client, Snavely, was pressed for money. Each of said statements was unwarranted by the facts, was false and misleading, was known to [petitioner] to be such, and was made by [petitioner] with intent to induce Mrs. Scarpitti to purchase the royalty interest from Snavely. . . . Mrs. Scarpitti's said purchase was induced by the statements of [petitioner] above set forth and by her confidence in [petitioner] as a long established attorney at law in San Diego."

In view of the record we can only conclude that petitioner has failed in his burden to show that the findings of the Board of Governors are not supported by the evidence. (*In re Hallinan,* 48 Cal.2d 52 [307 P.2d 1].) It should be noted, however, that there are no specific findings of fraudulent practices on the part of petitioner in connection with the gold transaction.

■ Petitioner seeks to escape responsibility by the fact that the nature of the contract with the American Marketing Associates, Inc., was not concealed from, and in fact was made available to Mrs. Scarpitti, and that the clear meaning of the contract negated any implication that the company was irrevocably committed to manufacture cribs and produce royalties. Thus, it is claimed, it cannot reasonably be concluded that Mrs. Scarpitti knowingly purchased something other than what she got, that is, an opportunity to share in royalties of a speculative nature.

Petitioner's contention is not supported by the record. There is nothing therein from which we may conclude that Mrs. Scarpitti understood the nature of the commitment of the American Marketing Associates, Inc. The agreement does not expressly provide that the company is committed to produce and sell no cribs, and such fact is ascertainable only by what is omitted from rather than what is included in the provisions of the agreement. While it is thus indicated that a legal construction of the agreement is required in order to fully understand it, the only professional views made available to Mrs. Scarpitti were those of petitioner. He assigned a firm

value to the royalties, indicated that the cribs were in actual production and would be on the market within a month, and that a royalty payment would be made on a fixed date. Moreover, it was found that she relied upon such representations in view of petitioner's standing as an attorney. Accordingly, it cannot be realistically concluded, as petitioner would have us conclude, that Mrs. Scarpitti knew or reasonably should have known that the royalties had only speculative value.

Petitioner also contends that his conduct did not involve moral turpitude, within the legal meaning of that concept. Accepting the factual findings of the Board of Governors, as we are persuaded we should, it follows that at the very least petitioner concealed or suppressed material facts which would have influenced Mrs. Scarpitti's decision, and made misrepresentations, termed as errors in judgment, which he knew or should have known were inaccurate. "Petitioner contends that moral turpitude cannot be predicated upon errors of judgment made in good faith by an attorney. In view of his superior knowledge of the condition of the [company] at the time he suggested to Mrs. Schmidt that it would be a better investment for her than paying off her mortgage, it was his duty to disclose such facts to her even in the absence of the attorney-client relationship. [Citations.] The evidence would support an implied finding that he acted in bad faith in recommending the investment." (*Krieger* v. *State Bar*, 43 Cal.2d 604, 610 [275 P.2d 459]; see also *Grove* v. *State Bar*, 63 Cal.2d 312, 315 [46 Cal.Rptr. 513, 405 P.2d 553]; *Scofield* v. *State Bar*, 62 Cal.2d 624, 629 [43 Cal.Rptr. 825, 401 P.2d 217].) But, petitioner further contends, because he did not participate in or contemplate any personal gain or profit from the transaction, he cannot be guilty of an act involving moral turpitude, citing *In re Clark*, 52 Cal.2d 322 [340 P.2d 613]. It is said in that case at page 324: "Although violations of the Corporate Securities Act are essentially *malum prohibitum* rather than *malum in se*, it does not follow that they may not involve moral turpitude. If they are not merely technical, but are accompanied by an intent to evade the act with the object of gain or profit, they involve moral turpitude."

We do not read the *Clark* case to hold that in those instances of a violation of the Corporate Securities Act moral turpitude is involved *only* where the objective is personal gain or profit. While such conduct most assuredly involves moral turpitude, it does not encompass the full range of fraudulent intent which may accompany a violation of that act or the

commission of any other crime. Moreover, while it appears that none of Mrs. Scarpitti's funds were transferred directly to petitioner, he nevertheless was personally involved in the crib venture to an extent beyond that of an attorney rendering counseling or other professional services. He was, for all practical purposes, engaged in a joint venture with Snavely from whom he had acquired, through Kaufman, a royalty interest in his own behalf. Snavely profited considerably from petitioner's activities and petitioner must be deemed to have personally gained therefrom by virture of the interests which he acquired in consideration, at least in part, for inducing Mrs. Scarpitti to transfer her funds to Snavely. ▇ Finally, we fail to distinguish the impropriety of fraudulent conduct on the part of an attorney for reasons of personal gain from that for reasons of the gain of his client.

It is further contended by petitioner that the findings involving the importation of gold from Mexico are improper and irrelevant to the issues. We must agree with petitioner that standing alone these matters as found by the Board of Governors do not constitute grounds for disciplinary action. ▇ However, there is no impropriety in considering these matters as a part of the circumstances of the commission of the crime of which petitioner was convicted. The gold transactions occurred within a short time after the criminal offense in question, and were proposed by petitioner to Mrs. Scarpitti as a means of recouping her losses resulting from the fraudulent sale of securities. Certainly, on the record an investigation of the gold transactions is justified under the direction of subdivision (b) of section 6102 of the Business and Professions Code which requires that we discipline an attorney if we find moral turpitude not only in the crime itself, but also the ''circumstances of its commission.'' In conviction cases we have heretofore considered dismissed and pending criminal charges, in addition to the charge of which the attorney was convicted, in resolving the question of moral turpitude. (*In re Freiburghouse,* 52 Cal.2d 514 [342 P.2d 1]; *In re Clark,* 52 Cal.2d 322 [340 P.2d 613]; *In re Rothrock,* 25 Cal.2d 588 [154 P.2d 392].) In the instant case the gold transactions were the basis of additional counts in the criminal proceedings which were dismissed upon petitioner's plea of guilty of the violation of the Corporate Securities Act.

While the Board of Governors were entitled to consider the gold transactions it appears that they attached no particular significance thereto and made no findings of specific impropriety in that connection. We are of the view that the findings

which were made in this connection demonstrate extreme gullibility on the part of both petitioner and Mrs. Scarpitti, but on the record presented such findings have little bearing on the issues presented, and we have given them little if any weight in our resolution of the issues.

Petitioner has failed to sustain his burden of demonstrating lack of support for or lack of justice in the recommendation of the Board of Governors (*Haley* v. *State Bar,* 60 Cal.2d 404, 405 [33 Cal.Rptr. 609, 385 P.2d 1]), and that recommendation appears to be fair, just and appropriate. (See *Johnstone* v. *State Bar, ante,* pp. 153, 158 [49 Cal.Rptr. 97, 410 P.2d 617]; *In re Clark, supra,* 52 Cal.2d 322, 329; *Krieger* v. *State Bar, supra,* 43 Cal.2d 604, 611.)

We are persuaded for the foregoing reasons that petitioner's conduct in inducing Mrs. Scarpitti to purchase a royalty interest which he should have known to have only a speculative value was fraudulent, and involved moral turpitude as well as a violation of the Corporate Securities Act.

It is ordered that petitioner be suspended from the practice of law for a period of one year, the order to become effective 30 days after the filing of this opinion.