[Civ. No. 34465. Second Dist., Div. One. Mar. 11, 1970.]

DAVID DARRELL RING et al., Plaintiffs and Appellants, v.
BURTON E. SMITH, as Real Estate Commissioner, etc.,
Defendant and Respondent.

COUNSEL

Max Fink for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, Arthur C. deGoede and Edmond B. Mamer, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

LILLIE, J.—Appellant Ring's license as real estate broker, and that of appellant Friedman as real estate salesman, having been revoked by respondent, they unsuccessfully sought a peremptory writ of mandate ordering each such license restored. They appeal from the judgment denying the writ. On November 22, 1967, appellants entered pleas of *nolo contendere* to two counts of an indictment charging violations of the Corporate Securities Act (Corp. Code, § 26104, subd. (a)), to wit, sales to two persons of certain corporate stock without a permit. In addition to being fined, each appellant was sentenced to one year in the county jail. Thereafter, on May 17, 1968, one of respondent's deputy commissioners filed an accusation against appellants asserting as grounds for disciplinary action the foregoing two transactions as well as their *nolo contendere* pleas. The accusation further alleged that the crimes in question involved moral turpitude, thus subjecting appellants' licenses to suspension or revocation under the provisions of section

10177, Business and Professions Code;[1] and that their conduct would have warranted the denial of appellants' applications for a real estate license. (Bus. & Prof. Code, § 10177, subd. (f).)

On June 21, 1968, a notice of hearing was mailed to appellants and to Max Fink, their attorney, notifying them that the hearing on the accusation would be held on August 8, 1968. Subsequently, on August 7, 1968, appellants and their attorney were notified by mail that the hearing had been reset for November 12 and 13, at a designated place and hour. On November 12, 1968, neither appellant was present at the time and place set for the hearing. Attorney Burton Marks, however, appeared on behalf of Mr. Fink to request a continuance based on a letter from Mr. Fink to the Division of Real Estate for the attention of respondent's counsel, Mr. Kalenius; Marks read the letter into the record. After declaring that he "understood from [his] clients that this matter would be continued," Mr. Fink continued, "in any event, I have, unfortunately, found it necessary to immediately leave for Washington and I will be gone the entire week of November 11"; the letter concluded with the statement that January and March would be convenient months for the hearing which, Fink felt, would require a full week.

Commenting that the hearing was known by appellants and Mr. Fink for "just a little over three months," and while he could continue the matter for good cause "but I have yet to detect good cause," the hearing officer denied the motion for continuance, and the hearing proceeded without either appellants or their counsel being present. Thereafter, his proposed decision was issued by the hearing officer which respondent commissioner subsequently adopted without change or modification. It provided for revocation of appellants' licenses, cause for such disciplinary action being found to exist pursuant to section 10177, subdivisions (b) and (f), Business and Professions Code, *supra*; further it was expressly found that appellants evaded the pertinent provisions of the Corporate Securities Act "intending to evade said act with the object of gain to themselves."

In the subsequent mandamus proceeding, submitted for decision on the transcript of the administrative hearing, the trial court found that all of respondent's findings were supported by the weight of the evidence and that respondent did not abuse his discretion to the prejudice of either appellant, particularly in denying their motion for a continuance of the administrative hearing.

---

[1]*Section 10177 reads in pertinent part:* "The commissioner may suspend or revoke the license of any real estate licensee, . . . who has done any of the following:

". . . . . . . . . . . . . . .

"(b)' Entered a plea of guilty or *nolo contendere* to, . . . a felony or a crime involving moral turpitude, . . ."

■ As their first point on appeal, appellants challenge the finding that there was no abuse of discretion in denying their motion for a continuance; to the contrary, they assert they were thus deprived of due process of law since the failure to grant a continuance was tantamount to denying the right to counsel as guaranteed by both the federal and state Constitutions. In support of their position they cite *In re Ali,* 230 Cal.App.2d 585 [41 Cal.Rptr. 108], a proceeding in habeas corpus wherein a judgment of conviction was vacated upon a showing that on the day of trial defendant appeared without counsel and informed the court that his attorney had notified him the previous evening that he had to enter a hospital for treatment. In granting the relief requested, the court held that an accused should not be prejudiced by denying him a continuance where he is not responsible for counsel's absence due to sickness and where he did not have sufficient time to secure other counsel. Of course the instant situation is different, and appellants concede that the reasons for their motion at the administrative hearing were different from those in *Ali* although the results are assertedly "quite similar"—in *Ali* defendant was convicted of a crime while here two persons were deprived of their licenses to pursue their chosen occupation. As indicated in Mr. Fink's letter, parts of which have been quoted above, appellants themselves were partially responsible for his absence at the hearing since he labored under the impression the matter would be continued because of independent action on their part. Too, and unlike *Ali,* sickness of counsel was not the reason for the requested continuance since Mr. Fink "found it necessary to leave immediately for Washington."

Furthermore, it is statutory law that "When a hearing officer . . . has been assigned to such hearing, no continuance may be granted except by him . . . for good cause shown." (Gov. Code, § 11524.) ■ Accordingly, as declared in *Givens* v. *Department of Alcoholic Beverage Control,* 176 Cal.App.2d 529, 532 [1 Cal.Rptr. 446], there is no absolute right to a continuance in a proceeding such as this, hence, unless the refusal of the hearing officer to grant a continuance was an abuse of discretion, there was no denial of due process. ■ The administrative transcript discloses that when the hearing officer asked respondent's attorney whether there was any opposition to the motion for continuance, the latter replied: "Well, this happened August 8, the same thing. Now it is happening today. It appears we will never get to trial. With reference to the letter [from Mr. Fink], that was marked Saturday [November 9]. Monday [November 11] was a holiday, and to this hour it hasn't—or at least about a quarter to 9, it had not arrived at my office, and I knew nothing about this motion for a continuance until [Mr. Marks] informed me this morning [Tuesday, November 12]." Two witnesses—Alpert and Daniels—were waiting to testify. The hearing officer then stated: "Some of the papers that I have before me indicate that a state-

ment to respondent was first mailed on May 17, 1968. That was pursuant to Section 11505 of the Government Code. There's also the original of a letter which purports to be from Max Fink dated June 3, 1968, in which he requests that the matter be delayed, or the administrative matter be delayed or that it be entirely set aside until the civil action is determined. Then there is a notice of hearing for August 8, 1968, of this matter, and that is dated June 21, 1968. Then finally, there is a notice of change of time and place of hearing dated August 7, 1968 which indicates that the matter is to be held today and tomorrow at 9 a.m. It does seem that the letter [from Mr. Fink] . . . is not very timely in this matter."

It is pointed out in *Givens* (citing authorities) that there is no absolute right, even in a criminal trial, to be represented by a particular attorney, when this is made the basis of a motion for a continuance (*supra,* 176 Cal.App.2d at p. 532); and, of course, the administrative hearing here was not a criminal proceeding nor governed by criminal legal precedents. (*Shakin* v. *Board of Medical Examiners,* 254 Cal.App.2d 102, 110 [62 Cal.Rptr. 274, 23 A.L.R.3d 1398].) Too, even in a criminal prosecution the right to counsel may be waived and such waiver may be established if the defendant is unduly dilatory. (*People* v. *Rogers,* 150 Cal.App.2d 403, 416 [309 P.2d 949].) In the instant case appellants and their attorney had written notice of the hearing date more than three months prior thereto; indeed, even before notice of the continued date was mailed, it is not denied that appellants' counsel had written to the agency involved suggesting that the matter be delayed or dismissed until a certain civil suit had been determined. The record shows that appellant Ring is an attorney licensed to practice in this state, while appellant Friedman shared space in Ring's real estate office; perhaps this will explain why Mr. Fink was presumptuously advised that the "matter would be continued." All of the foregoing circumstances, coupled with the last minute oral motion for continuance, reasonably warranted the inference that dilatory tactics had been adopted which would needlessly delay the hearing at hand. Absent some showing of more substantial legal effect than that presented to the hearing officer, he did not abuse his discretion in concluding that no good cause was established for the continuance so tardily requested; hence, his denial of the motion will not be disturbed on appeal. (*Givens* v. *Department of Alcoholic Beverage Control, supra,* at p. 532.)

Appellants' second, and remaining, point is that the record before the hearing officer fails to support the finding that either committed a crime involving moral turpitude. The original decision, later adopted by respondent and subsequently upheld by the trial court, found that appellants intentionally evaded the Corporate Securities Act with the object of gain to themselves; it further found, citing *In re Clark,* 52 Cal.2d 322, 324 [340

P.2d 613], that these violations of the Act involved moral turpitude. The *Clark* case declared: "Although violations of the Corporate Securities Act are essentially *malum prohibitum* rather than *malum in se,* it does not follow that they may not involve moral turpitude. If they are not merely technical, but are accompanied by an intent to evade the act with the object of gain or profit, they involve moral turpitude." (*Supra,* p. 324.)

■ Citing *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20], appellants correctly argue that respondent's findings must be supported by substantial evidence; however, as also stated in that case, the trial court is authorized to exercise its independent judgment as to the above issue and, therefore, with the trial court rests the ultimate power of decision. ■ *Moran* further holds that in proceedings of this kind the rule on appeal is no different from that governing any other civil case; accordingly, the question before this court is whether the evidence, viewed in the light most favorable to respondent as the prevailing party below, sustains the findings now challenged. Thus, with these rules in mind, we briefly summarize the pertinent evidence. In August of 1964, Mr. Alpert, first of the victims, went with his accountant to a meeting at appellant Ring's office at which other prospective investors were present. The proposed investment was in a sand and gravel pit or mine in Riverside County operated by Eagle Silica Sand Company, two shares of whose stock could be sold for $12,000. The money, Ring told Alpert, would possibly be used for the purchase of new equipment; Alpert was also given a "prospective" of what the company was earning without the additional capital—"a hundred and 'fifty thousand dollars— and what it would do with additional equipment." According to Alpert, Ring also told him: "By getting that equipment, they would be able to produce more and a finer product, which in turn would—the returns would be astronomical." Alpert subsequently bought $12,000 worth of stock; when he failed to receive his certificates, Ring gave various reasons therefor when questioned about the matter.

About the same time, after a meeting in appellant Ring's office and a visit to the mine accompanied by both appellants, the second victim, Mr. Daniels, also invested $12,000 in the same company. Like Alpert, he too was told that the money would be used for new equipment; he too never received his certificates.

Subsequently both victims met with Ring concerning the non-issuance of their certificates. At first Ring stated, "Everything's just fine. What are you guys all het up for? It's just a matter of just time." Later Ring told them there was nothing there, they had no money and needed more wörking

capital. To that end Ring suggested that Alpert and Daniels sell some of their stock to certain of their friends and "maybe we can make it go."

Preceding the finding that appellants acted with the object of gain to themselves was a finding that at least a portion of the monies of the victims was taken by appellants for themselves in repayment, or partial repayment, of a $15,000 loan previously made by them to a Mr. Shepard who was affiliated with the sand and silica business; too, that appellants had paid themselves salaries in an undetermined amount from the above monies. Appellants challenge the legal substantiality of the following evidence relied on for these two determinations. Alpert testified that he "found out more or less . . . that [Ring] paid off some other debts that were owing to the corporation prior to when we invested into it." Daniels, in turn, testified that the money "was used to pay off old debts of the company that was being taken over into the corporation. It was used in part to pay Mr. Ring and Mr. Friedman's salaries. That's where most of it went." Received in evidence was a statement by Ring to the probation officer that he and Friedman loaned $15,000 of their money to Mr. Charles Shepard and his brother, Dean Shepard; also received was a letter from Daniels to the same probation officer that "Ring never did invest $24,000 in cash for the purchase of stock in the corporation, but instead, I now understand that he and Mr. Friedman used the money from the corporate account into which my money went to repay themselves $15,000, which prior to the time the corporation was formed, had been loaned to the Shepards. . . ."

▓ Appellants correctly assert that these last two letters were hearsay, although they recognize the possible pertinency of section 11513, subdivision (c), Government Code, that "Hearsay evidence may be used for the purpose of supplementing or explaining other evidence . . . ." In *Wilke & Holzheiser, Inc.* v. *Department of Alcoholic Beverage Control,* 65 Cal.2d 349, 376 [55 Cal.Rptr. 23, 420 P.2d 735], it is pointed out that "relevant hearsay evidence may be admitted at an administrative hearing if it is the kind of statement upon which 'responsible persons are accustomed to rely in the conduct of serious affairs' [citations]. . . ." There can be no doubt that both letters belong in the above category. Too, it is clear that such evidence serves to supplement the direct testimony of Mr. Daniels that the money was used to pay off old obligations and, in part, to pay appellants' salaries. Indeed, appellants concede that if their salaries were paid by part of the money invested, they would be benefited directly thereby, while nevertheless insisting that Daniels' testimony was wholly unsupported. Appellants' theory seems to be that the law requires independent evidence of conduct warranting disciplinary action, like the corpus delicti in a criminal case; but this is not a criminal prosecution. Too, we are not the trier of the

facts and we cannot say as a matter of law that the inferences and conclusions drawn on three separate occasions below were unreasonable.

Finally, after its decision in *In re Clark, supra,* the Supreme Court stated in *In re Langford,* 64 Cal.2d 489, at pages 495-496 [50 Cal.Rptr. 661, 413 P.2d 437]: "We do not read the *Clark* case [*In re Clark,* 52 Cal.2d 322 (340 P.2d 613)] to hold that in those instances of a violation of the Corporate Securities Act moral turpitude is involved *only* where the objective is personal gain or profit. While such conduct most assuredly involves moral turpitude, it does not encompass the full range of fraudulent intent which may accompany a violation of that act or the commission of any other crime. . . ." Such pronouncements become significant in light of the representations made to Mr. Alpert about the company's prospective earnings, $150,000, without the additional capital received through the investment sought from him, as well as the contemplated profit picture given to Daniels. One of the purposes of the governing legislation is to insure, as far as possible, that real estate brokers and salesmen will be honest, truthful and of good reputation. (*Buckley* v. *Savage,* 184 Cal.App.2d 18, 31-32 [7 Cal.Rptr. 328].) By making the above representations appellants manifestly demonstrated a lack of integrity. Coupled with their admitted pleas of *nolo contendere,* the evidence hereinbefore summarized sufficiently supports not only grounds for disciplinary action under section 10177, subdivision (b), Business and Professions Code, but also similar action under section 10177, subdivision (f) of the same code.

The judgment is affirmed.

Wood, P. J., and Gustafson, J., concurred.