[L.A. No. 30456. In Bank. Nov. 18, 1975.]

In re RICHARD R. MURPHY on Suspension.

534

**COUNSEL**

Richard R. Murphy, in pro. per., for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar (board) that petitioner be suspended from the practice of law for three years on conditions of probation, including actual suspension for one year. Petitioner was admitted to practice in December 1953 and has no prior record of discipline.

On February 7, 1972, petitioner was convicted, under section 25540 of the Corporations Code, of five counts charging him with offering and selling securities in violation of the conditions of a stock permit issued by the Commissioner of Corporations. Thereafter this court referred the matter to the State Bar for hearing and recommendation on the question whether the facts and circumstances surrounding petitioner's commission of the crime of which he was convicted involved moral turpitude and, if so, the nature and extent of discipline to be imposed. The board determined that moral turpitude was involved and recommended suspension as hereinabove indicated.[1] Petitioner's conviction was affirmed in *People* v. *Murphy,* 35 Cal.App.3d 905 [111 Cal.Rptr. 295].

[1] Two of the three members of the local administrative committee found that petitioner's commission of the crime involved moral turpitude and recommended suspension, but the third member dissented. Since the committee's initial "findings" did not contain specific findings of fact, they were returned to the committee with the request that a revised report be issued setting forth the facts on which the committee had based its conclusion that moral turpitude was involved.

The committee was again divided two to one on the moral turpitude question; but all three members, noting that petitioner had been unable to practice law for a substantial period of time following his indictment in December 1970 and had suffered financial losses and other penalties as a result thereof, recommended that petitioner be only formally reprimanded.

The record shows that petitioner was employed in September 1968 by a group of doctors to form a corporation to enter the medical malpractice insurance field. He incorporated California Caduceus Company, Inc. (CCC) and acted as its attorney, secretary, and a director from November 1968 to February 28, 1969. On the latter date, during a proxy fight, petitioner (who had obtained proxies for about 72 percent of the shares of CCC) was elected chairman of the board of directors. He served as such until December 29, 1969.

In November 1968 the directors decided to purchase an 88½ percent interest in Casualty Insurance Company of California (Casualty) for $946,000, payable in installments over a period of approximately 13½ months.[2] To raise the required capital, it was contemplated that stock in CCC, of the par value of $1,000 per share, would be sold.

On November 6, 1968, the Commissioner of Corporations granted a permit to CCC to sell a total of 459 shares of its stock to 42 named individuals. Effective January 2, 1969, the commissioner issued an amended permit authorizing the sale of 2,541 additional shares of CCC stock to medical doctors, dentists, and pharmacists having a net worth of $50,000 exclusive of home, car, and furnishings and to attorneys and requiring that the proceeds be deposited in a depositary at the Newport National Bank at Newport Beach. Although he knew of the limitations of the permit, petitioner participated in the sale of CCC stock to persons other than those belonging to the class designated in the amended permit.[3] Furthermore, because there was real danger that the installment deadlines would not be met if the proceeds from the sale of the stock were deposited in the depositary, petitioner agreed that the depositary would not be used. In addition, although under the terms of the permit the shares could be issued only for cash, petitioner twice had 25 shares

[2]Subsequently the terms of the purchase were renegotiated, and, among other things, a shorter period of time for payment was provided.

[3]Petitioner testified that prior to filing its application for the amended permit CCC was required to prepare a prospectus that was not disapproved by the Commissioner of Corporations. Petitioner prepared a number of drafts, which he submitted to the commissioner. One of them, dated November 18, 1968, was not disapproved. The amended permit required that such a prospectus be given to each prospective subscriber or purchaser of CCC shares before subscription or purchase thereof.

In his testimony petitioner indicated that in making sales to persons outside the class designated in the amended permit he had relied on language on the back of page 4 of the prospectus, reading: "The amount of the public issue will be 2,541 shares, at $1,000 per share, to be sold to *mostly* people in the medical community, *such as* medical doctors of all types, pharmacists and other members of the paramedical community." (Italics added.)

issued to himself in payment for legal services and later used those shares as part of the collateral he put up in obtaining a loan from Henry Holtz. Over 100 additional shares were issued to other persons for which either no cash at all or substantially less than the $1,000 par value per share was received.

In the meantime, various factions on the board of directors became involved in bitter fighting regarding the handling of matters pertaining to CCC, and arrangements were made first for one faction, and later for another, to be bought out. In the course of the handling of the financial arrangements required for this purpose and for meeting payments due for the Casualty stock, substantial bank indebtednesses were incurred, and funds were borrowed from Mr. Holtz. The Casualty stock was pledged as collateral for one $250,000 bank loan, which was later combined with another $250,000 loan. When the final payment was due on the purchase of the stock owned by the second faction, petitioner gave his own check for $140,000 without having sufficient funds in his account, allegedly with an understanding with one of the bank officers that the bank would cover the check. When it later became apparent that the bank would not do so, arrangements were made to have a $140,000 check of Casualty issued to petitioner. That company did not have funds to cover the check, but apparently the money was somehow raised in time.

During the time the various factions were opposing each other, two restraining orders were obtained against petitioner, one in February 1969 and the other in June 1969, which orders petitioner blatantly ignored. Significantly, the February order restrained petitioner from participating as an officer or director of CCC or from acting in any capacity on its behalf.

In June 1969 an application was filed with the Commissioner of Corporations for a curative permit, the application containing an acknowledgment that CCC shares had been sold during the period from January through May 1969 to persons other than those belonging to the class designated in the January 2, 1969, amended permit. As hereinabove indicated, petitioner was at that time on the board of directors. After the application was filed, petitioner participated directly in the sale of additional shares in violation of the conditions of the original permit as amended.

During October 1969 petitioner, after signing a stipulation with the California Insurance Commissioner providing, in part, that Casualty would no longer sell policies for medical malpractice insurance, represented in writing to shareholders of CCC that Casualty had "people standing in line" for its medical malpractice coverage and that the company was then writing policies at a substantially lower premium rate than a competitor. As a result of these misrepresentations, at least two shareholders purchased additional shares.

The offenses of which petitioner was convicted occurred during the period from August 1969 through October 1969, long after the application for a curative permit had been filed and while petitioner had knowledge that no curative permit had been issued. As a matter of fact, the curative permit sought was never issued. Instead, criminal indictments were handed down against petitioner and one of the other directors.

At their trial petitioner and his codefendant took the position that the sales of shares to persons not qualified under the terms of the amended permit to purchase them were made in good faith in order to acquire the funds needed to complete CCC's acquisition of Casualty and that their efforts in negotiating the sale of the stock were undertaken for the purpose of saving CCC's assets from being plundered by a conspiratorial group composed of a certain congressman, a well-known financier, the California Commissioner of Corporations, and the California Insurance Commissioner, all of whom were engaged in a scheme to destroy CCC or acquire its assets for themselves. As said by the Court of Appeal, however: "Stated simply, the only question before the trial court was whether [petitioner and his codefendant] had illegally offered and sold shares in violation of the conditions of the CCC permit. They practically admitted the charges. Their only defense was that they had done so in a bona fide effort to save the company."

■ As this court has consistently pointed out, the burden is on the petitioner to show that the board's recommendation is erroneous or unlawful (see, e.g., *In re Bogart*, 9 Cal.3d 743, 748 (1) [108 Cal.Rptr. 815, 511 P.2d 1167]; *In re Plotner*, 5 Cal.3d 714, 716 (1) [97 Cal.Rptr. 193, 488 P.2d 385]); but petitioner has failed to meet this burden.

■ In the present proceeding, petitioner's conviction of the criminal offenses is conclusive evidence of his guilt. (Bus. & Prof. Code, § 6101.) ■ Some violations of the Corporate Securities Act may not

involve moral turpitude (see *In re Langford,* 64 Cal.2d 489, 495 [50 Cal.Rptr. 661, 413 P.2d 437]), and the question of moral turpitude is one of law for this court to determine, based on the record in the State Bar proceeding (*In re Higbie,* 6 Cal.3d 562, 569 [99 Cal.Rptr. 865, 493 P.2d 97]). As stated by this court in *In re Alkow,* 64 Cal.2d 838, 840 [1b] [51 Cal.Rptr. 912, 415 P.2d 800, 21 A.L.R.3d 882], however, "Moral turpitude has been defined as 'everything done contrary to justice, honesty, modesty, or good morals' . . . ." ■ In the present matter, the conclusion is inescapable that petitioner's conduct involved moral turpitude, the board's finding in this respect being entirely warranted in view of his acts of fraud and deceit and his repeated disregard of court orders and governing statutes, as well as the requirements applicable to the sale of the CCC shares.

■ In determining the appropriate degree of discipline to be imposed, this court will give great weight to the recommendation of the board. (*In re Hanley,* 13 Cal.3d 448, 451 [119 Cal.Rptr. 5, 530 P.2d 1381]; *Yokozeki* v. *State Bar,* 11 Cal.3d 436, 450 [113 Cal.Rptr. 602, 521 P.2d 858].) ■ Under all the circumstances, it is concluded that the discipline recommended by the board herein is eminently fair.

It is therefore ordered that petitioner be suspended from the practice of law for three years, with execution stayed and petitioner placed on probation for three years. The conditions of probation shall include actual suspension for one year and compliance with the conditions recommended by the disciplinary board. It is also ordered that petitioner comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) within 30 and 40 days, respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion, and the period of probation shall commence as of the date on which the order becomes effective.