CINCINNATI BAR ASSOCIATION *v.* SHOTT.

[Cite as Cincinnati Bar Assn. v. Shott, 10 Ohio St. 2d 117.]

(D. D. No. 66—Decided April 19, 1967.)

118

*Mr. C. Jackson Cromer, Mr. David E. W. Chatfield* and *Mr. Richard H. Ward,* for relator.

*Messrs. Arnold, Fortas & Porter, Mr. Thurman Arnold, Mr. James F. Fitzpatrick, Mr. James G. Andrews, Jr.,* and *Mr. John A. Lloyd, Jr.,* for respondent.

*Per Curiam.* The first charge of the complaint is that the respondent was convicted of selling securities in Ohio without a license and of selling in Ohio unregistered nonexempt securities in violation of Section 1707.44(A) and (C) of the Revised Code.

The General Assembly of Ohio has made such a violation a felony.

The respondent was charged with the violation of this section, indicted by the Grand Jury of Hamilton County and, upon trial, convicted by a jury. This conviction was affirmed by the Court of Appeals for Hamilton County, and, upon appeal to this court, the appeal as of right was dismissed, 173 Ohio St. 542. Upon appeal to the Supreme Court of the United States, the appeal was dismissed and certiorari denied on May 13, 1965, 373 U. S. 240.

An action for a writ of habeas corpus was instituted in the United States District Court for the Southern District of Ohio, Western Division, which proceeding was dismissed by John W. Peck, J. Upon appeal to the United States Court of Appeals, Sixth Circuit, the judgment of the District Court was affirmed (365 F. 2d 191), and the Supreme Court of the United States denied certiorari, 35 L. W. 3234.

The respondent, therefore, has been convicted of a felony

in this state and has exhausted all rights of appeal and has been sentenced to a term of one to five years in the penitentiary. Further, the respondent has been denied a writ of habeas corpus by the United States Supreme Court. The respondent has also been found liable in a civil action, based upon constructive fraud for the amounts which Stickler paid to him (interest or profit on loans or investments to Stickler who was engaged in a fraudulent Ponzi scheme), and he has exhausted his right of appeal in that action.

The respondent's position is that the conviction for violation of the Securities Act does not involve moral turpitude. The respondent's position was stated in the record of the hearing before the panel of commissioners, D. D. No. 66, volume I, page 14, by his counsel in these words:

"The offense, which is clearly on its face not a crime involving moral turpitude, involved the borrowing of money— that's all the charge there is. A perfectly innocent act * * *."

It may be arguable that a conviction for a technical violation of the Ohio Securities Act, consisting of the giving or selling of promissory notes at a usurious rate of interest, does not involve moral turpitude under the rules of this court. (It should be noted that the respondent characterizes his transactions with his friends and relatives as the giving of promissory notes by him to his friends for the money loaned by them, calling for the payment of a usurious rate of interest by him, but, on the other hand, he characterizes his transactions with Stickler, which also involved the giving of promissory notes by Stickler to him, at usurious interest rates collected by respondent, as not the borrowing of money on a promissory note but as an investment in the enterprise of Stickler, from which respondent realized a profit rather than interest.)

However, the facts, as testified to by the respondent himself at the hearing before the panel of the Board of Commissioners on Grievances and Discipline, do not support the position of the respondent that his conviction, under the circumstances of this case, does not involve moral turpitude.

It is clear from respondent's testimony that the transactions of borrowing money from a few relatives and close friends on promissory notes at usurious rates of interest or profit were

not simple and ordinary promissory-note-loan transactions as the respondent now asserts that they were.

In volume II of the record of the hearing before the panel of commissioners, at page 164, the respondent describes how this entire scheme began, in the following words:

"About eight years ago I was approached by Leslie D. Stickler, who was then a practicing attorney here in Cincinnati, about a business proposition.

"Mr. Stickler told me that he represented various small contractors who from time to time found it profitable to make quick loans, and that they were willing to pay premium rates for these loans.

"Mr. Stickler told me that he did not have money enough himself to handle all these loans, and that as a favor to me he would let me in on what he termed 'a good deal.'

"I think it would be helpful to the panel to understand that I have known Les Stickler since childhood, we went through grade school and high school together, we were friends, and I trusted him.

"Because of that, I took only two precautions before giving any money to Stickler. I did research the Ohio law and *I found that it is not a crime to accept a premium for loaning money.* " * * *

" * * * I also checked with another attorney, Richard J. Morr, who at that time was an Assistant City Prosecuting Attorney for the city of Cincinnati, who told be that he had been *loaning money to Stickler* for some time before I was approached by Stickler. Because of his experience as a practicing attorney, I had respect for his judgment, and when I questioned him he assured me that there was nothing illegal or wrong in the transaction and made some point of telling me about the profits that he had made by dealing with Stickler.

"He also told me that although Stickler always emphasized the risks that were involved in dealing with these contractors, that *he had never defaulted with Morr whenever any of these loans came up to be due and paid.*

"I finally decided to risk $1,000. When that first *note came due Stickler paid me immediately,* and thereafter Stickler would

call me periodically to tell me he had additional deals that were available to me, and frankly, the temptation was too great to refuse.

"However, never once did he fail *to pay me my notes when they fell due.*

"My dad knew about my dealings with Stickler and my father asked me about the possibility of his investing money with Stickler. And my mother, who is now deceased, had inherited a little money when her brother died, and she likewise wanted to invest that money with Stickler.

"My wife's two aunts and her uncle wanted to likewise invest with Stickler.

"Although my experience with Stickler up to that time had been very profitable, I did remember that Stickler quite often mentioned the high degree of risk involved in these transactions, and I did not want to feel responsible if any one of these contractors failed and one of my relatives lost money, *so I finally thought of a way whereby these relatives could make a profit without actually taking a chance or losing their money.*

"*I permitted my relatives to make loans directly to me, and I gave them my own promissory note, a conventional cognovit note, with my own personal signature on it.*

"*Since I had already made money through Stickler, I felt that I was in a better position to assume the risk than my relatives.*

"*In order to partially compensate for the fact I assumed all the risk, I gave these relatives of myself and my wife an amount that was equal to one-half of the profit that I received from Stickler. In other words, my father would loan me $1,000 and Stickler would want to borrow the $1,000 from me and repay me $200 profit, the promissory note that bore my signature that I gave my father was in the total amount of $1,100. The $100 which I received was not only compensation for my assuming the entire risk, but it also helped pay my office expense, including my secretary, who handled all the paper work, the transfers, the banking involved, and the bookkeeper I had to hire to keep these records accurate.*

"*As time went on, a number of my close friends asked if*

*they too could participate in these transactions. Altogether there were 15 to 20 relatives or close friends of long standing who made these loans to me.*

"Because of the tax considerations involved, I employed a firm of certified public accountants, who advised me to form a partnership. I then hired an attorney in Cincinnati here who specialized in tax work, who formed a partnership and set up trusts for my wife and my son. This family partnership was known as the Shott Investment Company, and consisted of myself, myself as trustee for my wife, myself as trustee for my son, and my father.

"I formed this partnership, Shott Investment Company, in January of 1960, and after that most of the loans were made to the partnership.

"* * *

"I was somewhat beside myself when this thing first blew up, but when the realization hit home that the thing was a phony and a fraud, I thought to myself, well, after all, these people are not dealing with Stickler, they trusted me, so I bore the entire loss." (Emphasis added.)

After this Ponzi scheme "blew up," the respondent testified, at page 173 *et seq.* of the record, that he paid those "friends and relatives," from whom he had taken money to invest in Stickler's scheme with an agreement that they would receive half the profit made on the investment, a total of $56,000. At pages 174 and 175 of the record, he names these people and the amounts which they had invested with Stickler through him, ranging from $2,000 to $12,000. At page 156 of the record, respondent *states that he considered the profits which he received from his investments with Stickler as "income" and not "interest."* At page 176 of the record, respondent testified that in one year he made personally $67,000 profit in this scheme and that he reported it as income and paid tax on it.

At page 186 of the record, the respondent testified:

"* * * I think, oh, possibly three to five months before this thing, I guess you used the phrase, blew up, or call it what you will,—I decided there was just too darn much money invested with me by Stickler [*sic*]. I had taken what I thought was normal, reasonable precautions, even to the extent *where*

*I took out a $100,000 life insurance policy on Stickler's life in the event he got struck down by an automobile or something.*

"*So I told Stickler, three to five months before this date in January, that I decided I was not going to renew any of the deals at all, as these deals fell due I was going to be paid out.*

"*The people whose money I had borrowed, for example, Paul Winter, I told him the same thing. I said I decided I am going to slow the thing down.*" (Emphasis added.)

At page 200 of the record, the respondent testified:

"* * * When I was making this money off Stickler I of course had in the back of my mind, I guess human nature, who knows, my God, the man could walk out and be run over by a car. That's why I said I even went to the point of taking an insurance policy. But rather than deposit the money, what I did I invested through the firm of Merrill, Lynch, Pierce, in government or municipal bonds, that were tax free, and when the thing, if I can use the term, blew up, I had to crash sell all of that * * *."

At page 201 of the record, he testified:

"* * * I was paying out these people, the majority of these deals were with the Shott Investment Company. *I had very few personal loans from my own coffer to Stickler*, and when I would get say approximately $3,000 profit check from Stickler, $1,500 of that would have to go to my aunt, my mother. I had to pay the taxes on the thing, obviously with this kind of money there was a pretty high tax bracket, and I was escrowing money to pay the taxes. That's what I did.

"Q. You have estimated two years at $87,000 [profit], this is some $31,000 more than you actually paid back to these people, is that correct? A. Yes.

"Q. So actually as a net problem you have not lost anything yourself either, as related to Mr. Stickler's ventures, is that correct? A. *Well, I guess that's true. Over-all I probably did make money, to be very honest. How much, I don't know.*" (Emphasis added.)

And at page 202 of the record:

"Q. Do you know how many promissory notes you issued to these people over a period of years? A. Numerically?

"Q. Yes. A. I don't, sir."

124

With regard to his bookkeeper, the respondent gave the following testimony at page 209 of the record:

"A. Therein lies another story. I hired Ruf, as I said, to keep my books and records, because I feared this thing could potentially be a tax problem. Then one day Ruf, I can't recall now just when, he told me he could no longer do this, I would have to get somebody else to keep my books and records. And then it developed, again without my knowledge, that Ruf had gone to Stickler without me knowing about it, Stickler had woven his spell over him, and you would have had to have known John Ruf, he was a very quiet, hard-working man, he was a Uriah Heep in David Copperfield, typical fellow, with a glass eye shade, was hard-working, sincere chap, good man, was just hypnotized by Stickler.

"Ruf himself even had two sons, and I have heard, whether it is true or not, they were going around knocking on doors soliciting money for this thing, and when this thing blew up Jack Ruf owed, I don't know how many people it was, I do remember it was something like $260,000 that was mentioned, owed these folks, he just couldn't take it, he killed himself.

"Q. And you and he were jointly indicted? A. There were four people, no, not jointly. Stickler was indicted, I was indicted, Ruf was indicted. The fourth, Dick Brower, Richard Brower, he has never been brought to trial, and the indictment against me was returned in May of 1961, as I remember."

Finally, it is unmistakably clear from the respondent's own testimony (pages 213 and 214 of the record) *that the offense upon which the respondent was convicted under the Ohio Securities Act was not a simple loan transaction secured by a promissory note, but was a part of this Ponzi scheme involving Stickler and the respondent and a man by the name of Sestito, from whom the respondent secured money and to whom he gave a promissory note as a security, which was the basis of the charge against him under the Securities Act.* The respondent describes this transaction in his testimony, at pages 212, 213 and 214 of the record, as follows:

"Q. Were you indicted for borrowing money or for reloaning or for loaning your own money, your own note?
"* * *

"A. May I say this, and try to answer your question. Again, if you will just bear with me, I am trying to answer the judge's question. The testimony in my trial, as I say, it is in the transcript, I can say it in a full sentence—Sestito testified, as I say, he was the only witness that appeared, Sestito testified he had known me for 12 years, I had represented him in several matters, that in September of 1960, I believe, he stopped in the office, not by any prearrangement, just for kibitzing, so to speak, as clients do, and that at that time *I told him about this Stickler thing and asked him if he would loan me $2,000, and I told him that I in turn would split the profit that I received with Stickler, and that I would give him my own personal note payable in 60 days.*

"* * *

"Q. *Did you tell him about Stickler?* A. *Yes.*

"Q. *What did you tell him you were going to invest?* A. *No, I told him about Stickler.*

"Q. *You told him you were going to invest money with Stickler and give him your note?* A. *That's correct, and give him half of the profit.*

"Q. *Is this true of all the people?* A. *Oh, yes. If the panel wants to hear from them, and bring in all the creditors who are available that I dealt with, and they would I guess say that I told them about the Stickler thing.*

"But if I can finish what I started to say, Judge, he testified that he said, 'I don't even want your note, I know you, I trust you,' but in any event, I said, 'Well, you take a note, something might happen to me, I might be killed.' *Sixty days later to the date he came into my office, I gave him my check for $2,250, the gross return from Stickler was $500, I told Sestito I would split it with him, he got the one check for $2,000 as principal, plus $250, and that was the state's case. And on the basis of that testimony I was convicted for dealing in unregistered securities.*" (Emphasis added.)

It is clear from the affidavits which the respondent filed with this court, from testimony of respondent quoted above, and from the findings of the United States District Court and the Sixth Circuit Court of Appeals that the respondent "is charged with constructive knowledge of the fraudulent intent of [Stick-

ler] under facts which are not disputed," that the promissory notes which the respondent gave to his friends were part of a fraudulent scheme through which he raised money to invest with Stickler, from which he realized and shared with his friends enormous profits while other members of the public who invested with Stickler were defrauded.

In this set of circumstances, respondent's acts, in violation of the Securities Act, do constitute moral turpitude.

Charge three of the complaint is that respondent knowingly and willfully violated the Ohio usury laws by receiving an excessive rate of return upon the speculative investments he made in Stickler's fraudulent Ponzi scheme.

The transactions upon which this complaint is based are described in the copies of affidavits which were submitted to this court by the respondent himself, attached to his motion to stay proceedings, dated April 2, 1965, and filed in this court on April 5, 1965. The motion, supporting memorandum and attached affidavits were submitted by respondent's counsel.

The affidavit of John E. Shriver, a certified public accountant, whose firm was retained to assist the trustee in bankruptcy for Leslie D. Stickler, bankrupt, in the reconstruction of the bankrupt's accounts pursuant to the order of the Referee in Bankruptcy of the United States District Court for the Southern District of Ohio, Western Division, reads in part as follows:

"The undersigned, John E. Shriver, certified public accountant, hereby states that he has examined the books and records of the bankrupt Leslie D. Stickler and from his examination of such books, records, and schedules has constructed a list of dealings between Edgar I. Shott, Jr., attorney, and the aforesaid Leslie D. Stickler, which is attached hereto and marked exhibit A.

"Further the undersigned states that his examination of such books, records, and schedules disclosed that Edgar I. Shott began lending money to Stickler in the fall of 1956. During the period of Stickler's enterprise Shott was involved in approximately 600 transactions. For the two year period from September 17, 1956, to September 17, 1958, there were approximately 50 transactions. From September 23, 1958, until September 28, 1959, he was involved in approximately an additional

150 transactions with Stickler. From September 29, 1959, through September 29, 1960, he was involved in at least 336 transactions, and from September 30, 1960, through January 4, 1961, there were at least 62 additional transactions. According to Mr. Stickler's records the interest rates varied from 120% per annum, to 360% per annum. On a cumulative basis, according to Mr. Stickler's records, Shott loaned Stickler $1,020,510, received back as principal $969,000, and in interest $394,410 for a total of $1,363,410. Stickler's records disclose that $51,510 in principal is still owed Shott. If interest had been calculated at the maximum legal rate of 8% per annum on a daily basis balance for the total period of Shott's dealings with Stickler from September 1956, Stickler should have paid $21,212.57 as interest, so that the excess interest or profit or consideration paid for the use of Shott's funds was $373,197.43.

"* * *

"Such records further disclose that Stickler paid Shott in some instances by endorsing checks to Shott received by Stickler from other lenders who were also participating in Stickler's enterprise. As an example, Stickler records disclose that on January 4, 1961, one Maxine S. Treleaven loaned Stickler $3,500. Such person was referred to Stickler by 'Shott.' See exhibit B. Stickler turned said funds represented by 'Treleaven checks' over to Shott directly on the same day. See last item on exhibit A.

"Payments were made by the bankrupt by checks payable to 'Edgar I. Shott, Jr.,' and 'Shott Investment Co.,' etc.

"During the operation of the aforesaid enterprise, Stickler borrowed sums in excess of $3,300,000. He paid back as interest or profit, in excess of $1,350,000, and he paid back as principal, in excess of $1,800,000, and according to his schedules in bankruptcy, Stickler still owes in excess of $1,950,000 both as principal and interest to his creditors. Shott received from Stickler a total sum of $1,363,410 of which, according to Stickler's books and records, $394,410 was interest or profit and the balance principal.

"As a result of the enterprise, some of Stickler's creditors were paid in full, both principal and interest or profit, some of his creditors received nothing, some have received a portion

of the principal and substantial payments representing interest or profits.''

These transactions assumed such proportions that respondent organized the Shott Investment Company and had to hire an acountant to keep his records.

It was represented that Stickler was loaning money to contractors who were desperately in need of financing and, therefore, were willing to pay extremely high interest rates for loans. However, a supplemental affidavit by Shriver, submitted to this court by respondent himself and attached to his motion to stay proceedings, dated April 2, 1965, and filed on April 5, 1965, states in part:

''* * * the financial records and accounts of Leslie D. Stickler, bankrupt, did not disclose any loans to 'contractors' or receipts of payments from 'contractors' as such term is described in paragraph 6 of the affidavit of defendant attached to his motion for summary judgment in these proceedings; that, in fact, substantially all payments of substance made by the bankrupt were to lenders from whom the bankrupt had borrowed funds in the operation of his enterprise.''

Shriver's affidavit shows further that 81 people loaned or invested more money with Sticker than they received in repayment.

The respondent received in payments from Stickler $342,-900 more than he loaned to or invested with Stickler.

The trustee in bankruptcy, Thomas A. Conroy, brought an action against the respondent in the federal District Court, seeking judgment against the respondent for the money paid to him by Stickler, on the ground that he was a part of this scheme to defraud innocent persons who loaned or invested money with Stickler.

At the time, April 5, 1965, when respondent filed his motion to stay proceedings, Judge Peck had written an opinion in the case of *Thomas A. Conroy, Trustee in Bankruptcy for Leslie D. Stickler,* v. *Edgar I. Shott, Jr.,* and the relator appended that opinion of Judge Peck to its brief in this court. Judge Peck held that ''as to constructive knowledge, however * * * the record fully supports the conclusion that the defendant should have had knowledge of Stickler's fraudulent scheme.''

In his brief on the motion to stay proceedings dated April 2, 1965, filed April 5, 1965, in this court, counsel for respondent makes the following statement:

"We do not criticize the relator for calling at this time the attention of this court to Judge Peck's finding against respondent, even though this case played no part in the proceedings before the board. Indeed, in an action of this kind, it was the relator's duty. Certainly if the District Court's findings of fact in the bankruptcy case are correct, respondent has no defense whatever in this disciplinary proceeding because Judge Peck has, in that collateral proceeding, found that respondent was a party to a criminally fraudulent transaction. We concede that it was the duty of the relator to bring this decision to the attention of this court. Nevertheless, in doing so it puts the respondent in a position which makes it impossible to defend himself. This court is bound by the full faith and credit clause of the Constitution to treat Judge Peck's decision as conclusive evidence of respondent's guilt until that decision is reversed. This court has no jurisdiction to retry the issue before Judge Peck and determine whether or not Judge Peck made an erroneous decision. Therefore, if the case is heard on April 20, 1965, respondent has no defense.

"Judge Peck's decision has been appealed to the Court of Appeals for the Sixth Circuit, No. 16489. The appeal is not frivolous or insubstantial. The affidavits and other pleadings which have been filed we think demonstrate that respondent had no knowledge whatever of Stickler's fraudulent scheme. We confidently expect that Judge Peck's decision will be reversed. Unless it is reversed, respondent has no defense to the disbarment proceedings in this case.
" * * *

" * * * If the Court of Appeals sustains Judge Peck's position, our client will be automatically disbarred.

"On the present record the court is bound to find that respondent participated in a fraudulent scheme involving moral turpitude because it has no jurisdiction to retry or review Judge Peck's judgment. The sole court having jurisdiction over that issue is the United States Court of Appeals. In this situation justice to respondent clearly requires that these proceedings

be continued until the United States Court of Appeals has acted on respondent's appeal from Judge Peck's decision. Until that time, there is no possible way that respondent can defend himself against the charge of participating with Stickler in a fraudulent scheme to victimize the public."

On July 8, 1966, the United States Court of Appeals, Sixth Circuit, in the case of *Thomas A. Conroy, Trustee in Bankruptcy for Leslie D. Stickler, Bankrupt,* v. *Edgar I. Shott* (363 F. 2d 90), affirmed the holding of Judge Peck. Phillips, Circuit Judge, said in part:

"Upon the basis of the above quoted language from the opinion of the District Court, we conclude that defendant is charged with constructive knowledge of the fraudulent intent of the bankrupt under facts which are not disputed and that the District Court was correct in granting plaintiff's motion for summary judgment on the legal issue of liability.

" * * *

"The record discloses 600 or more transactions between defendant and the bankrupt, which presumably involved many loans, credits and repayments. The record does not demonstrate to our satisfaction that the cumulative total of $1,363,410 is the correct basis for judgment.

"The judgment of the District Court is vacated and the case is remanded for a redetermination of the amount of the judgment."

On December 5, 1966, the United States Supreme Court denied certiorari, 35 L. W. 3201.

Thus, the respondent, in the words of his own memorandum filed in this court on April 5, 1965, "has no defense to the disbarment proceedings."

The respondent was found by the board to have violated the usury laws of this state involving moral turpitude and by such acts to have violated Canon 32.

What constitutes moral turpitude is not subject to exact definition. However, in discussing the question, it must be kept in mind that we are not considering the question in relation to the ordinary layman but with respect to an attorney, one trained in the law.

In determining whether any given act by an attorney con-

stitutes moral turpitude, consideration must be given to the status of an attorney. In this case, we are confronted with one trained in the law who, by taking the oath as an attorney and accepting his certificate to practice, has assumed a position of public trust, holding himself out to the public as fit and capable of handling its funds and problems. He has assumed a position of responsibility to the law itself, and any disregard thereof by him is much more heinous than that by the layman who may breach the law in all innocence.

Thus, that which constitutes moral turpitude for a lawyer is far different from that which constitutes moral turpitude for the layman. The lawyer, because of his training and position of public trust, must be held to a more strict standard than the layman.

As this court said in *Cincinnati Bar Assn.* v. *Massengale,* 171 Ohio St. 442, at page 445, 171 N. E. 2d 713:

"To preserve its prestige and standing, the legal profession should not and must not tolerate conduct on the part of its members which brings the profession as a whole into disrepute and invites public condemnation." See *In re Clark,* 52 Cal. 2d 322, 340 P. 2d 613.

The respondent has been granted a reprieve of his sentence by the Governor until May 6, 1967, to permit a thorough investigation by the adult parole authority of respondent's application for executive clemency. However, a pardon will not and cannot rectify the acts which the respondent has committed or the course of conduct in which he has engaged. Annotation, 70 A. L. R. 2d 268, at page 331.

The objections to the recommendation of the board are overruled, the recommendation of the board is confirmed, and respondent is permanently disbarred from the practice of law.

*Judgment accordingly.*

STRAUB, MATTHIAS, O'NEILL, HERBERT, SCHNEIDER and BROWN, JJ., concur.

STRAUB, J., of the Sixth Appellate District, sitting for ZIMMERMAN, J.

TAFT, C. J., concurring. In my opinion, a convicted felon should not be regarded as an officer of our courts, at least while he is incarcerated in the penitentiary. Thus, we might reasonably hold that the words "conviction of a crime involving moral turpitude," as used in our Rule XVIII, include the conviction for any crime that results in a sentence to imprisonment in the Ohio Penitentiary, even where a criminal intent, other than an intention to do an act that is prohibited, is not an element of the crime. Cf. *Cincinnati Bar Association* v. *Smith* (1963), 174 Ohio St. 452, 190 N. E. 2d 267; *Cincinnati Bar Association* v. *Massengale* (1961), 171 Ohio St. 442, 171 N. E. 2d 713; and *Dayton Bar Association* v. *Prear* (1964), 175 Ohio St. 543, 196 N. E. 2d 773. If we so held, then, where the General Assembly has made a particular crime a felony and a defendant has been convicted thereof and sentenced to the penitentiary, it would be unnecessary for us to inquire further as to the character of the crime.

I hesitate to base Shott's disbarment on his conviction for violation of Section 1707.44(A) and (C), Revised Code, and his repeated violations of the usury laws, because there are other more substantial grounds for that disbarment. In Ohio, usury is not a crime and a usurious contract is enforceable, except as to the excess of interest above the legally permissible rate.

However, on April 5, 1965, respondent filed a motion "that all proceedings" herein "be continued pending the disposition of the appeal" to the United States Court of Appeals in *Conroy* v. *Shott*. This motion was granted.

In that motion it is stated:

"The relator has now chosen to append to its brief the opinion of Judge Peck of the United States District Court for the Southern District of Ohio in the case of * * * *Conroy* * * * v. * * * *Shott*. * * *

" * * *

"We do not criticize the relator for calling at this time the attention of this court to Judge Peck's finding against respondent, even though this case played no part in the proceedings before the board. Indeed, in an action of this kind, it was relator's duty. Certainly if the District Court's findings of fact in the bankruptcy case are correct, respondent has no defense

whatever in this disciplinary proceeding because Judge Peck has, in that collateral proceeding, found that respondent was a party to a criminally fraudulent transaction. We can see that it was the duty of the relator to bring this decision to the attention of this court. Nevertheless, in doing so it puts the respondent in a position which makes it impossible to defend himself. This court is bound by the full faith and credit clause of the Constitution to treat Judge Peck's decision as conclusive evidence of respondent's guilt until that decision is reversed. This court has no jurisdiction to retry the issue before Judge Peck and determine whether or not Judge Peck made an erroneous decision. Therefore, if the case is heard on April 20, 1965, respondent has no defense. * * *

" * * *

" * * * If the Court of Appeals sustains Judge Peck's position, our client will be automatically disbarred.

"On the present record the court is bound to find that respondent participated in a fraudulent scheme involving moral turpitude because it has no jurisdiction to retry or review Judge Peck's judgment."

After quoting most of Judge Peck's opinion, the opinion of the federal Court of Appeals (363 F. 2d 90, certiorari denied) states:

"Upon the basis of the above quoted language from the opinion of the District Court, we conclude that defendant is charged with constructive knowledge of the fraudulent intent of the brankrupt under facts which are not disputed and that the District Court was correct in granting plaintiff's motion for summary judgment on the legal issue of liability."

I do not believe it necessary to rely upon constructive knowledge. In my opinion, the affidavits submitted by respondent in support of the foregoing motion of April 5, 1965, almost inevitably lead to the conclusion that Shott actually knew of "Stickler's Ponzi scheme" and was an active participant therein.

For example, the affidavit of the accountant for the trustee in bankruptcy shows that Stickler received over $3,300,000 and paid out less than $3,200,000; that Shott received over $1,360,000 of what Stickler paid out; and that Shott received back over

134

$342,000 more than he paid to Stickler. Thirty-nine others also received more than they paid to Stickler but their total excess receipts were less than $186,000. Eighty-one others received less than they paid Stickler, their losses amounting to over $657,000.

These figures impel the inference that Shott knew what was going on. That inference is fortified by the report of that accountant introduced before the hearing panel. This discloses that between July of 1960, and January 7, 1961, when Stickler announced he could no longer meet his obligations, respondent reduced the amount owed him from a high of over $177,000 to below $52,000.