In re Application For Disciplinary ·Action Against Scott G. ANDERSON, A Member of the Bar of the State of North Dakota.

No. 8726.

Supreme Court of North Dakota.

Feb. 8, 1972.

Thomas A. Mayer, Bismarck, for Grievance Comm:, of the Supreme Court.

Huseby & Backes, Ltd., Fargo, for Scott G. Anderson.

TEIGEN, Justice.

This is a disciplinary proceeding in this court for the revocation or suspension of the certificate of admission to the bar of this state of Scott G. Anderson, a regularly licensed attorney of this court.

Scott G. Anderson was admitted to practice as an attorney and counselor at law in the courts of the state of North Dakota by a certificate of admission dated July 15, 1966, and has been duly licensed as an attorney at law in this state for each year since that date.

Scott G. Anderson entered a plea of guilty in the United States District Court for the District of North Dakota, Northwestern Division, as a coconspirator with two other defendants also named in an indictment, to the charge that he wilfully, knowingly and unlawfully did combine,

conspire, confederate and agree, together with the other defendants and divers other persons, to commit a violation of Section 215, Title 18, United States Code, by causing a fee of $7,000 to be paid to the president of First Western State Bank of Minot to induce him to make and procure, on behalf of Yonker, Inc., a loan from said bank in the sum of $350,000, guaranteed by the Small Business Administration. The indictment charges that the conspiracy began about November 4, 1968, and continued until on or about January 7, 1969. Scott G. Anderson was sentenced on November 12, 1970, was ordered to pay a fine to the United States in the sum of $3,000, and was placed on probation for a period of two years, subject to the condition, among others, that he pay the fine within one year. On February 23, 1971, the United States District Judge terminated the respondent's probation. The charge to which Scott G. Anderson entered a plea of guilty is classified as a misdemeanor.

The Grievance Commission of the Supreme Court of this state investigated the alleged misconduct and determined that the conviction constitutes a basis for either the suspension of Mr. Anderson's certificate of admission or his disbarment. The Grievance Commission made its report and findings against Mr. Anderson and submitted them, together with a formal complaint, to this court.

This court directed the filing of the formal complaint with its clerk. Thereafter the formal complaint, a copy of the findings of the Grievance Commission of this court, and a summons were duly served upon Mr. Anderson. Subsequent thereto, the Grievance Commission filed an amended formal complaint with this court, which was also ordered filed, and it, together with the findings of the Grievance Commission of this court, and a summons were duly served upon Mr. Anderson. Thereafter, and in accordance with the Rules of Disciplinary Procedure of this court, the said Scott G. Anderson served his answer to the amended complaint.

It appearing from the answer that Scott G. Anderson admitted the charge of misconduct contained in the amended complaint but alleged that there were mitigating facts attendant upon said plea, this court, by order, set the matter for hearing before this court on October 5, 1971, at which time it heard arguments in support of and in resistance to the recommendation for disciplinary action and authorized the respondent Scott G. Anderson to file with this court, in writing, any affidavits which he deemed necessary in support of his plea in mitigation.

The only affidavit filed was that of the respondent Scott G. Anderson. In his affidavit Mr. Anderson avers that he was attorney for Yonker, Inc., and that this corporation requested him to contact First Western State Bank of Minot to determine if said bank would be interested in participating in a loan to Yonker, Inc., in the amount of $350,000, to be guaranteed by the Small Business Administration, and what its "points" or fee would be. After negotiating with said bank and his client Yonker, Inc., he proceeded to negotiate with the bank to secure the loan and agreed that he would have his client pay First Western State Bank a fee of $7,000 if it could secure the Small Business Administration guaranteed loan. He further avers that the loan was secured and that the aforementioned fee of $7,000 was paid to one Alexander D. Leslie, who was then vice-president of said bank. He also avers that the initial conference was with the codefendant Gary R. McDaniel, who was president of First Western State Bank, and that subsequent negotiations and loan servicing were handled by the codefendant Alexander D. Leslie. He also avers that the $7,000 fee previously agreed to was delivered to Alexander D. Leslie at Minot, North Dakota, by the vice-president of Yonker, Inc., and that the said Scott G. Anderson was present at the time of delivery. He then avers that neither he nor his client was aware as to what became of the $7,000 after it was delivered. He further

avers that the codefendants Gary R. Mc-Daniel and Alexander D. Leslie also entered pleas of guilty to the conspiracy charge which had been placed against him concerning the Yonker, Inc., fee. The final averment in mitigation states that it has not been established what became of the $7,000 fee which was paid to Alexander D. Leslie nor does he, Anderson, have any knowledge whatsoever as to what became of the fee after it was delivered. Therefore, Mr. Anderson was faced with the fact that the other two persons in the chain of delivery had previously entered pleas of guilty and that he had no proof whatsoever that the fee had ever been deposited in First Western State Bank. Thus he argues that his plea of guilty was dictated by circumstances and that it has in no way brought discredit upon the legal profession; that had he demanded a trial by jury such trial would have seriously jeopardized his client's financial standing in the business community. Thus he argues that his plea of guilty was dictated by circumstances beyond his control.

The brief and the oral presentation in this court by Mr. Anderson's attorney suggest that this court must determine whether there was a violation involving moral turpitude in view of the mitigating facts attendant upon his plea of guilty, and whether the conspiracy constituted a violation involving moral turpitude to such an extent that the public interest would be served by prohibiting Mr. Anderson from continuing in the practice of law. He argues that the purpose of disciplinary proceedings should be to protect the public from lawyers who fail to maintain required standards of ethics, citing in support thereof In Re Peterson, 178 N.W.2d 738 (N.D. 1970). He further points out that Mr. Anderson was charged with conspiracy with the codefendants Gary R. McDaniel and Alexander D. Leslie, who were officers of the bank, and that he, Anderson, was not an officer of the bank but attorney for Yonker, Inc., which corporation wished to negotiate for the loan. He points out that the violation does not involve the common-ly accepted charge of moral turpitude by an attorney. It does not involve any relation to the court, to the judge, or to a client; misappropriation of a client's property or money; misconduct in an official capacity; misconduct involving the general public; embezzlement; larceny; bribery or extortion; use of trust funds; or the commingling of funds. In other words, the charge to which Mr. Anderson plead guilty does not involve moral turpitude in any type of fiduciary capacity other than to his client, and he points out that the client in this case was well-satisfied with the legal efforts of Mr. Anderson. He also points out that the conduct of Mr. Anderson does not constitute that type of misconduct which would be considered as being done with malice or deliberation, or as importing any act of baseness, vileness or depravity generally considered as elements involving moral turpitude; that punishment of an offending attorney is not the objective of disciplinary proceedings but that primary consideration should be given to the question of whether there is a likelihood, if no discipline is imposed, that Mr. Anderson will engage in unprofessional conduct in the future. On the basis of these arguments the attorney for Mr. Anderson asks that this court dismiss the proceedings.

The claim made by Mr. Anderson in his affidavit submitted in mitigation does not comport with the fact that he pleaded guilty to a charge that he wilfully and knowingly did combine, conspire, confederate and agree with his codefendants to commit the offense. Further, it does not comport with the overt act set forth in the indictment, to which he entered a plea of guilty, as to the mechanics employed to pay $7,000 to his coconspirators. The overt acts alleged are that on or about January 7, 1969, the secretary of Yonker, Inc., cashed a check drawn on Yonker, Inc., in the sum of $7,000 and, on the same day, the respondent Scott G. Anderson and the secretary of Yonker, Inc., rented an airplane at Fargo, North Dakota, and flew to Minot, North Dakota, and delivered the

sum of $7,000 in cash to the codefendant Alexander D. Leslie at the airport at Minot and that, in turn, the said Alexander D. Leslie delivered to the secretary of Yonker, Inc., the proceeds of the said Small Business Administration loan.

Section 27–14–02(1), N.D.C.C., provides:

"The certificate of admission to the bar of this state of an attorney and counselor at law may be revoked or suspended by the supreme court if he has:

"1. Committed * * * a misdemeanor involving moral turpitude;"

The Supreme Court Rules of Disciplinary Procedure, effective August 1, 1965, also provide:

"Any acts committed by an attorney contrary to accepted standards of honesty, justice, or morality, including but not limited to those outlined in Section 27–14–02, North Dakota Century Code, * * * may constitute cause for discipline."

The respondent Scott G. Anderson admits that he committed the misdemeanor but argues, for the reasons set forth above, that the commission of the misdemeanor does not involve moral turpitude.

We disagree. What constitutes moral turpitude is not subject to exact definition. However, in considering this question, we must keep in mind that we are not considering the question in relation to a layman but with respect to an attorney. In this request the supreme court of Ohio, in Cincinnati Bar Association v. Shott, 10 Ohio St.2d 117, 226 N.E.2d 724, 733 (1967), stated:

"In determining whether any given act by an attorney constitutes moral turpitude, consideration must be given to the status of an attorney. In this case, we are confronted with one trained in the law who, by taking the oath as an attorney and accepting his certificate to practice, has assumed a position of public trust, holding himself out to the public as fit and capable of handling its funds and problems. He has assumed a position of responsibility to the law itself, and any disregard thereof by him is much more heinous than that by the layman who may breach the law in all innocence.

"Thus, that which constitutes moral turpitude for a lawyer is far different from that which constitutes moral turpitude for the layman. The lawyer, because of his training and position of public trust, must be held to a more strict standard than the layman.

"As this court said in Cincinnati Bar Ass'n v. Massengale, 171 Ohio St. 442, at page 445, 171 N.E.2d 713, at page 715:

"'To preserve its prestige and standing, the legal profession should not and must not tolerate conduct on the part of its members which brings the profession as a whole into disrepute and invites public condemnation.' See In re Clark, 52 Cal.2d 322, 340 P.2d 613."

Anderson did not receive the $7,000 paid to his coconspirators, who were officers of the bank. However, he did conspire with them to violate Section 215, Title 18, United States Code, which prohibits any officer of a bank from receiving any fee, commission, gift, or thing of value from a person who procures a loan from the bank of which he is an officer, for procuring the loan. A violation of this section constitutes an offense against the United States. Anderson and his coconspirators were charged under Section 371, Title 18, United States Code, which makes it an offense for two or more persons to conspire to commit any offense against the United States, or any agency thereof, in any manner or for any purpose, and one or more of such persons does any act to effect the object of the conspiracy. Under the penalty provisions of the two statutes, the conspiracy in this case was a misdemeanor. It is noted that Anderson was paid $3,000 for his services by Yonker, Inc., but this fee was determined by agreement between An-

derson and his client and is not involved here. We assume, however, that the federal court, in assessing a fine in the amount of $3,000 against Anderson, sought to take the profit out of the transaction.

In addition to the fact that Anderson entered a plea of guilty to the charge of conspiracy, we find the record sustains the conclusion that he wilfully, knowingly and intentionally conspired with his coconspirators to violate the federal law. In our opinion this conduct is not justified and encourages disrespect for the law which Anderson had sworn to uphold when he was admitted to the bar of the State of North Dakota. It is a disregard of principle and law amounting to moral turpitude. It is conduct which is contrary to the accepted standards of honesty, justice and morality and is contrary to the Code of Professional Responsibility of the American Bar Association which has been affirmed and adopted by the State Bar Association of North Dakota. One of the purposes of the Code is to provide standards by which to judge the transgressor.

Section 27–14–02(1), N.D.C.C., quoted above, provides that the certificate of admission to the bar of this state of an attorney and counselor at law may be revoked or suspended by this court if he has committed a misdemeanor involving moral turpitude.

In State v. Malusky, 59 N.D. 501, 230 N.W. 735, 71 A.L.R. 190 (1930), this court defined moral turpitude as:

"Moral turpitude is evidenced by an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man or to society in general."

In that case our court determined that a violation of the prohibition law as a second offense involved moral turpitude.

Moral turpitude is defined in 58 C.J.S. Moral at 1201, as follows:

" 'Moral turpitude' has been defined as meaning an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man, and this definition has been given by a great many authorities and approved by all that have considered the question. The term has also been defined as meaning anything done contrary to justice, honesty, principle, or good morals; everything done contrary to justice, honesty, modesty, or good morals; anything done knowingly contrary to justice, honesty, or good morals. 'Moral turpitude' has also been defined to mean baseness, depravity, or wickedness; base or shameful character; a base or shameful act."

■ Unquestionably, moral turpitude is involved when an officer of a bank receives any fee, commission, gift or thing of value from a person for procuring a loan for him from the bank of which he is an officer, which is in violation of Section 215, Title 18, United States Code. If the actual commission of the offense involves moral turpitude, then a conspiracy to commit the offense also involves moral turpitude. In re McAllister, 14 Cal.2d 602, 95 P.2d 932 (1939); Otash v. Bureau of Private Investigators and Adjusters, 230 Cal. App.2d 568, 41 Cal.Rptr. 263 (1965).

"It has been said that a criminal conspiracy is a partnership in crime, and that there is in each conspiracy a joint or mutual agency for the prosecution of a common plan. Thus, if two or more persons enter into a conspiracy, any act done by any of them pursuant to the agreement is, in contemplation of law, the act of each of them and they are jointly responsible therefor. This means that everything said, written, or done by any of the conspirators in execution or furtherance of the common purpose is deemed to have been said, done, or written by each of them. * * *" 16 Am. Jur.2d, Conspiracy, Section 14.

It is our conclusion that the conspiracy with which Anderson was charged and to which charge he entered a plea of guilty was based upon acts committed contrary to accepted standards of honesty, justice or morality which were contrary to the statutes governing attorneys and the Rules of Disciplinary Procedure promulgated by this court. For the reasons set forth herein, we conclude and hereby order that the certificate of admission to the State Bar of North Dakota, issued to Scott G. Anderson, be suspended for a period of six months from the date of this order and until he is reinstated, as provided for by Section XIII of the Supreme Court Rules of Disciplinary Procedure.

It is so ordered.

STRUTZ, C. J., and ERICKSTAD, PAULSON and KNUDSON, JJ., concur.