Filed 11/25/13  Davis v. San Diego County Employees Retirement Assn. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| EARNEST A. DAVIS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION,<br><br>    Defendant and Respondent. | D063316<br><br><br><br>(Super. Ct. No. 37-2011-00097407-<br> CU-WM-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Ronald S.

Prager, Judge.  Affirmed.


Earnest A. Davis, in pro. per., for Plaintiff and Appellant.

Crowell & Moring, Steven P. Rice and Queena Mewers, for Defendant and

Respondent.

Earnest A. Davis filed a petition for writ of mandate challenging the decision of

the Board of Retirement of the San Diego County Employees Retirement Association

(Retirement Board) denying his application for service-connected disability retirement

benefits. The trial court denied the petition. On appeal, Davis contends the evidence does not support the trial court's ruling. He also asserts the judgment should be reversed because he was denied a continuance to secure the attendance of a witness at the administrative hearing. He also raises claims of racial discrimination and hearing officer bias. We find no error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I. *Davis's Industrial Injury*

In December 1990 Davis began working for the San Diego County Air Pollution Control District (the District) as an associate air pollution control engineer. After working for the District for about 12 years, in 2002 he began experiencing pain and soreness in his hands. He was seen and treated by several physicians who diagnosed his condition as tendonitis and strain injury to his hand, wrist, and forearm due to repetitive activities and overuse, and concluded that it was 100 percent industrially related. After therapeutic and workplace interventions, Davis's condition improved to some degree. In 2005, a workers' compensation claim filed by Davis was settled with a stipulation that he had sustained a 3 percent work-related permanent disability to his wrists and thumbs.

In 2006 Davis reported worsening discomfort, which he attributed to an increase of workload activities such as writing and data entry. In 2007 he was transferred from the District's mechanical engineering section to its vapor recovery engineering section. In June 2008, he reported that his wrist and finger discomfort was worsening and he filed another workers' compensation claim.

2

In July 2008 the District placed Davis on a Performance Improvement Plan (PIP) based on an assessment that his work performance was deficient and needed to improve. The PIP detailed his deficiencies (including incomplete, incorrect, and untimely work submissions); specified the necessary steps to meet the District's expectations; and advised that failure to improve could lead to suspension, demotion, or termination.

## II. *Recommended Accommodations*

### A. *Reports from Dr. Braun*

Beginning in August 2008, Davis came under the care of Dr. Richard Braun, who examined him on a monthly basis for several months. In August 2008, Dr. Braun recommended that Davis engage in no keyboarding for one month. Davis was absent from work from August 12 to August 28, 2008. On September 2, 2008, the District extended his July 2008 PIP for an additional month; provided extensions of the deadlines for projects that were due during his absence; and advised him that projects that were past due before his absence should be completed "as soon as possible." On September 9, 2008, the District granted him a temporary medical leave. In December 2008, Dr. Braun recommended that Davis be placed on total temporary disability unless a job was available that involved no keyboarding.

In February 2009, Dr. Braun diagnosed Davis with "[m]usculoskeletal pain associated with repetitive use of the hands in a workplace activity environment," and "[b]ilateral hand swelling associated with repetitive use of the hands for gripping, twisting, and pinching activities performed repetitively." Dr. Braun concluded that Davis had "a disability precluding fine manipulation with specific reference to mousing and

3

computer keyboard activities, contemplating that he has lost about 25% of his pre-injury capacity for performing . . . activities requiring finger dexterity." Dr. Braun recommended that Davis engage in keyboarding for *no more than 30 minutes each hour; i.e., he should perform a maximum of four hours of keyboarding work each day, divided into 30-minute segments*.

After the receipt of Dr. Braun's February 2009 report, the county workers' compensation adjuster (Armida Balvaneda) sent a memo dated March 5, 2009, to the District, noting the recommended 30 minutes per hour/four hours per day keyboarding restriction. Balvaneda instructed the District to determine whether Davis could return to his job or be reassigned to another District job with reasonable accommodations. Balvaneda stated that if no such accommodations could be made within the District, a search for other county positions would be commenced. She also suggested the District consider whether an application for disability retirement should be filed.

In March and April 2009, District personnel told Davis that they questioned whether he could perform his engineering duties with the 30 minutes per hour keyboarding restriction, but ultimately stated they could provide the accommodation at least on a temporary basis. They informed him they were seeking further clarification from Dr. Braun on the needed work restrictions, and were also waiting for a report from Agreed Medical Examiner (AME) Dr. Paul Murphy on this same question.

On April 6, 2009, Dr. Braun submitted a clarification to the District stating that Davis should not engage in "continuous or highly repetitive manipulation activities performed with his hands." Responding to a request from the District to differentiate

4

between fine manipulation and computer keyboard work, Dr. Braun stated: "The most significant aspect of this differential involves *the repetitive nature of the work*, rather than the fine manipulation preclusion previously discussed." (Italics added.) Dr. Braun reiterated his earlier recommendation that Davis could engage in 30 minutes per hour of keyboarding (or other fine manipulation work with his hands), but qualified the recommendation by stating that *continuous* fine manipulation activity during the 30-minute period should not be required. In this regard, Dr. Braun stated that "*continuous typing during a 30-minute period would aggravate [his] symptoms* and should not be required," and he "should not be expected to pursue constant manipulation of files or folders, continuous writing activities for 30 minutes, or the use of a computer keyboard-mouse for a continuous and repetitive period of 30 minutes." (Italics added.) Rather, Davis should "perform *intermittent activities of a varied type* that can be reasonably associated with a clerical job"; for example, he "could perform a short period of manipulation involving a computer keyboard and then pursue an activity such as reviewing and evaluating an application which could then be associated with manipulating a file or folder while pursuing a general multitasking clerical experience in the workplace." (Italics added.)

## B. *Report from Dr. Murphy*

The AME (Dr. Murphy) examined Davis on April 7, 2009, reviewed Davis's lengthy medical history, and set forth his conclusions in a June 5, 2009 report. Dr. Murphy summarized in detail Dr. Braun's testing results, opinions concerning Davis's injury, and recommendations concerning work restrictions, including the 30 minutes per

hour/four hours per day restriction on keyboarding. Dr. Murphy concluded that Davis had sustained a 100 percent industrially-related injury, consistent with "[m]usculoligamentous sprain/strain, bilateral upper extremities." He opined that Davis's condition had reached "maximum medical improvement"; his pain was "intermittent and slight in nature"; and occasionally his symptoms worsened to "slight to moderate." He stated Davis had a "total of 2% whole person impairment . . . referable to the bilateral upper extremities."[1] He recommended Davis should be "*precluded from fine manipulation contemplating 25% loss of pre-injured capacity for activities requiring finger dexterity and fine manipulation*." (Italics added.)

Following the receipt of Dr. Murphy's report, on June 9, 2009, county workers' compensation adjuster Balvaneda sent a second memo to the District noting that Davis "*should be precluded from fine manipulation, contemplating 25% loss of pre-injured capacity for activities requiring finger dexterity and fine manipulation*." (Italics added.) As in her previous memo, Balvaneda stated the District should determine whether there could be accommodations or a reassignment within the District; if not, a search would be made for a position in other county departments; and the District should consider the issue of filing for disability retirement.

---

[1] Dr. Murphy delineated his objective findings as "[t]enderness, bilateral wrists"; "[p]ositive Tinel's and Phalen's sign, bilateral wrists"; and "[s]light loss of motion, right and left shoulders in adduction." Regarding Davis's disability, Dr. Murphy stated: "No specific permanent impairment is noted referable to the wrists. [¶] However, a 2% upper extremity impairment is noted within each shoulder as a result of a loss of range of motion in extension and adduction. A 4% upper extremity impairment is noted. A total of 2% whole person impairment is noted referable to the bilateral upper extremities."

6

### III. *Davis's Return to Work, Termination, and Application for*

### *Disability Retirement Benefits*

Davis returned to work on June 16, 2009. In his PIP dated that same date, the District stated his current work assignment consisted of handling projects with pending "Permits to Operate"; he was required to submit at least four permits per day unless he had a field inspection that day; if he could not meet this deadline he needed to tell his supervisor the reasons in advance; and he should not have more than two field inspections per week. The June 2009 PIP also set forth his various work deficiencies that occurred before and after his earlier July 2008 PIP, including untimely, inaccurate, and insufficient work on his projects.

As we shall detail below, both before and after Davis's return to work in June 2009, Davis and District personnel became embroiled in a dispute over the required accommodations for his industrial injury and the adequacy of his work performance. Ultimately, the District suspended Davis for five days in July 2009; placed him on administrative leave for 10 days in August 2009; and in September 2009 terminated him for inefficiency, insubordination, and acts incompatible with or inimical to public service. Relevant to his discharge, the District claimed that upon his return to work, his performance problems heightened to the point that he was essentially performing no work on his projects.

On June 4, 2010, Davis filed an application for service-connected disability retirement benefits with the San Diego County Employees Retirement Association. After an administrative hearing, the Retirement Board denied his application. Subsequently,

the trial court denied his writ of mandate petition challenging the Retirement Board's decision.[2]

The merits of Davis's discharge are not at issue in this appeal. Rather, the matter before us is the denial of Davis's request for disability retirement benefits.

IV. *The Administrative Hearing*

At the administrative hearing before the Retirement Board hearing officer, the parties presented numerous documents generated before and during the course of the dispute over Davis's workplace accommodations, and extensive testimony from Davis and District personnel. We summarize this evidence to illuminate the parties' respective positions.

One of the issues in dispute between the parties at the time Davis was returning to work was whether Dr. Murphy's recommended restriction was different from Dr. Braun's recommended restriction. Davis maintained that Dr. Murphy agreed with Dr. Braun's 30 minutes per hour/four hours per day fine manipulation restriction. In contrast, the District focused on Dr. Murphy's statement in his report that Davis "be precluded from fine manipulation, contemplating 25% loss of pre-injured capacity for activities requiring finger dexterity and fine manipulation." The District viewed Dr. Murphy's report as controlling, and interpreted it to mean that Davis needed to have a 25 percent reduction in fine manipulation; i.e., he could properly engage in fine manipulation for 75 percent (six

---

2       Davis was represented by counsel at the administrative hearing before the hearing officer. He subsequently represented himself, including at the trial court mandamus proceedings and now on appeal.

hours) of his workday.[3]  District personnel acknowledged that they did not attempt to implement Dr. Braun's 30 minutes per hour/four hours per day restriction because they considered it superseded by AME Murphy's report.

Regardless of how the District interpreted the doctors' work restrictions, the District also claimed that the work assignment *actually* given to Davis upon his return to work (processing of gas station permits) required a *minimal* amount of fine manipulation, and thus was a proper accommodation that satisfied the parameters of his work restrictions.  Davis disputed the District's claim that only a minimal amount of fine manipulation was required for the gas station permit processing work.  Davis claimed that according to the District's own estimations, it took a minimum of one and one-half hours (90 minutes) to enter a single permit into the database; the entire 90 minutes involved keyboarding and fine manipulation; and thus he would have to keyboard for a minimum of six hours per day to process the required number of four permits per day.

In support of his position, Davis submitted a District memo dated October 1, 2007, which specified that the minimum amount of time to enter a vapor-recovery permit into

---

[3]  After Davis filed his application for disability retirement benefits, Dr. Murphy prepared a supplemental report in February 2010 to clarify his views on the accommodations recommended by Dr. Braun.  In this regard, Dr. Murphy stated:  "Dr. Braun's reporting is complex and, *in general I concur with his thoughts and opinions*.  However, I believe after careful review of my file that his opinions do not contradict my opinions regarding [Davis's] ability to perform the Associate Air Pollution Engineer Position."  (Italics added.)

9

the district's database system was one and one-half hours.[4]  The 90-minute time estimate

for permit data entry set forth in the 2007 memo was also included in subsequent

documents issued by the District, including Davis's July 2008 PIP and his June 2009 PIP

evaluation report.[5]  Davis testified that he could not safely perform six hours of fine

manipulation per day because the pain would be intolerable.[6]

In contrast, Davis's supervisor (Mahiany Ponte Luther) testified that when Davis

returned to work after his medical leave, the District "narrowed his responsibility down"

to processing gas station permits, which required only a small amount of typing or

---

[4]     This minimum time calculation was made for purposes of determining the minimum amount to charge a permit applicant for this particular task.

[5]     The 2007 memo contained a chart specifying the estimated times for a variety of tasks.  Regarding the data entry time for permits to operate ("PO"), the chart stated: "Time. . . .  1.5 . . . .  Enter PO into VAX/Cover Sheet."  The 2008 and 2009 PIP documents contained a similar chart, reiterating the same 1.5-hour time estimation for this data entry.

[6]     In addition to claiming the District had assigned him to a position that required excessive fine manipulation, Davis maintained that he should have been given duties that focused more on engineering analysis rather than data entry.  He explained he engaged in far less keyboarding when he worked in the mechanical section because he worked on a variety of projects that required him to determine the appropriate air pollution equipment; a single project could last for months and required a lot of research and phone calls; and there was little fine manipulation until the end of the process when it was time to issue a permit.  In contrast, gas station permits issued in the vapor recovery section involve equipment that has been preapproved by the state Air Resources Board, and accordingly there is little analysis, little time on the phone, higher volume, and a higher amount of keyboarding.

Davis made various suggestions to the District to accommodate his industrial injury, including that he verify the technical merits of projects before submittal to supervisors; that he be assigned a student worker to perform data entry tasks for him; and that he be transferred to a different engineering department.  The District did not implement these suggestions.

10

handwriting, and field inspections, which required no typing. Luther explained the District had formulated basic equipment codes containing pre-established conditions for the gas station permits.[7] The job of processing gas station permit applications required Davis to review inspection reports and test reports; make a decision as to which basic equipment code to use; enter a small amount of information into the database including the basic equipment codes; type or write out a one-page engineer recommendation document; and submit the permit for approval. Luther estimated that the entire process took about one hour for each permit.

---

[7] A basic equipment code is a unique number that corresponds with a set of conditions that goes on a permit.

Regarding the amount of required fine manipulation, Luther testified that the review of the inspection and test reports did not require substantial manual file handling because the necessary documents were on the top of the file. She estimated that the data entry, including the basic equipment codes, required "less than a hundred keystrokes" and took about five or 10 minutes to complete.[8] Davis was given permission to handwrite the one-page engineer evaluation document, which required about 10 minutes to complete.[9]

Regarding the October 1, 2007 District memo setting forth the 90-minute minimum time for permit data entry, Luther testified that by 2009 this time estimate was no longer applicable. Luther explained that after 2007, the District formulated the basic equipment codes containing the pre-established conditions for the permits, which shortened the time needed for the data entry. At Davis's request, he was provided refresher training on how to process the permits; the basic equipment codes were in a

---

[8]    The data that had to be typed included a description of the equipment (about four lines of typing); the basic equipment code (about five digits); and some rule references.

[9]    Luther testified that to accommodate Davis's typing and handwriting restrictions, the District did not assign him work such as issuance of "Authorities to Construct" which do not have standard conditions and require more typing or writing.
    The District also offered Davis voice-activated software, but Davis declined because he has a speech impediment that would prevent effective operation of the software. Additionally, the District placed "RSIGuard software" on his computer to assist with his keyboarding restriction; however, Davis requested that the software be removed.

searchable database; and Davis was provided a "cheat sheet" that specified which codes to use for a particular type of equipment.[10]

Luther acknowledged she did not send Davis a memo telling him that the 90-minute data-entry time estimate set forth in the 2007 memo was no longer operative, and that only about 10 minutes of data entry was now needed. However, she claimed that she had several discussions with him about how much time he was expected to spend on the issuance of the permits. Also, she testified that it "was really obvious" in 2009 that the 2007 estimation was no longer applicable because in 2007 the District did not have the standard conditions for the gas stations, and it would now be "almost impossible" to spend 90 minutes on data entry to issue a permit given the pre-established conditions.

V. *Retirement Board's Administrative Decision and Trial Court's Mandate Decision*

After hearing the parties' evidentiary presentations, the Retirement Board hearing officer concluded Davis did not show that he was permanently incapacitated from the performance of his duties as a District engineer, and accordingly recommended that his application for disability retirement be denied. The hearing officer stated that "[t]here was clearly a conflict in the evidence as to the amount of keyboarding" required of Davis, and that he had "carefully weighed" the credibility of the witnesses and evidence. The

---

10    According to Davis, before his departure on medical leave, he worked mostly on applications for authorities to construct rather than permits to operate. He acknowledged he was given a "cheat sheet" with the basic equipment codes, but claimed he was not told how to select a basic equipment code that would be approved by his supervisor. According to the District, Davis had issued permits while working in the mechanical section; the process in vapor recovery was the same; and Davis had issued two permits in vapor recovery in 2008.

13

hearing officer found that during the discussions with the District to accommodate his disability, Davis was "more confrontational than cooperative"; he was "less than candid" and "was not forthcoming" in this process; and he "did not participate sufficiently to balance the job expectations with his work restrictions." The Retirement Board subsequently adopted the hearing officer's recommendation and denied Davis's application.

Thereafter, the trial court denied Davis's mandamus challenge to the Retirement Board's decision, concluding that Davis did not show he was permanently incapacitated from performing his duties. The court stated the weight of the evidence demonstrated "the work modifications and accommodations made by the [District] satisfied the parameters of the work restrictions recommended by Doctors Braun and Murphy." The court reasoned that upon his return to work, the District amended his duties to consist only of conducting field inspections and issuing gas station permits, and these tasks did not require him to type or handwrite for more than 30 minutes at a time or for more than four hours per day. Rather, the data entry work required less than 100 keystrokes and could be completed in five or 10 minutes, and the District memo stating the data entry takes 1.5 hours was no longer applicable.[11]

---

[11] The trial court also noted that Dr. Braun's 30 minutes per hour/four hours per day maximum was not set forth in Dr. Murphy's recommendation.

14

DISCUSSION

I. *Sufficiency of the Evidence To Support Denial of Disability Retirement Benefits*

Davis argues the evidence does not support the trial court's rejection of his challenge to the administrative decision denying his application for disability retirement benefits. He contends the District never properly accommodated his industrial injury, and hence he was permanently incapacitated from performing his duties.

At mandamus proceedings that challenge an administrative decision affecting fundamental vested rights (including the right to disability retirement benefits), the trial court independently reviews the agency's findings to determine if they are supported by the weight of the evidence, while affording a strong presumption of correctness to the administrative findings. (*Welch v. State Teachers' Retirement System* (2012) 203 Cal.App.4th 1, 16; *Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204.) On appeal, we review the trial court's factual findings for substantial evidence. (*Welch, supra*, at p. 16.) We must draw all reasonable inferences in favor of the judgment, may not substitute our deductions for those of the trial court, and must defer to the trial court's factual findings unless the evidence is insufficient as a matter of law to sustain those findings. (*Id.* at. pp. 16, 21.)

Even when an employee is terminated for cause, the employee may be entitled to an award of disability retirement benefits if the employee's right to these benefits matured prior to the termination. (*Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 198, 206-207.) To receive disability retirement benefits, a county employee must show that the employee's service-connected injury has caused the employee to be "permanently

15

incapacitated for the performance of duty . . . ."  (Gov. Code, § 31720; *Rau v. Sacramento County Retirement Board* (1966) 247 Cal.App.2d 234, 238.)  Permanent incapacity exists if the employee's injury results in a substantial inability to perform his or her usual duties.  (*Curtis v. Board of Retirement* (1986) 177 Cal.App.3d 293, 297-298.)  When deciding whether the employee can perform the job duties, the fact finder may consider accommodations implemented by the employer to allow the employee to continue performing the job.  (See *Schrier v. San Mateo County Employees' Retirement Assn.* (1983) 142 Cal.App.3d 957, 961-962.)

The evidence supports the trial court's finding that the District accommodated Davis's disability in a manner that allowed him to continue to work as an engineer at the District, and hence he was not permanently incapacitated from performing his duties.  Upon his return to work, Davis was assigned the job of processing gas station permits at a rate of at least four per day.  Davis's supervisor testified that this work required fine manipulation that could be completed in less than 30 minutes per permit (i.e., a review of the documents on the top of the file; about five to 10 minutes of data entry for input of the standard codes; and about 10 minutes of handwriting to complete the one-page engineer evaluation document).  Thus, the completion of four permits per day would require no more than about two hours of fine manipulation daily.  Further, the trial court could reasonably infer that the fine manipulation need not be completed in the continuous, repetitive fashion that was contraindicated by Dr. Braun.  There was nothing to suggest the engineer could not break up the various tasks (i.e., reviewing the file,

16

inputting the standard codes, and writing the one-page engineer recommendation) in a manner that prevented undue repetitive fine manipulation.

Further, supervisor Luther refuted the documentary evidence submitted by Davis that reflected a larger amount of fine manipulation for processing permits; i.e., the 2007 memo which stated that 90 minutes of data entry was required for each permit, plus the 2008 and 2009 PIP documents which repeated this same time estimation. Luther testified that the adoption of the standard codes substantially reduced the data entry time specified in the 2007 memo, and this change would have been apparent to the engineers assigned to the gas station permit work in 2009. Apart from the time estimate derived from the 2007 memo, Davis did not present any direct evidence, from his own work experience or that of other engineers, showing that Luther had incorrectly assessed the amount of fine manipulation required to process a gas station permit in 2009. The trier of fact was entitled to credit Luther's testimony that, notwithstanding the information in the District's memo and PIP documents, by 2009 only a small amount of fine manipulation was necessary to process gas station permits. We cannot second guess this credibility resolution on appeal.

With regard to the dispute over the doctors' recommended work restrictions, the testimony of the District's personnel supports that although the District believed it could properly require six hours of fine manipulation per day, the District did not *actually impose* this level of fine manipulation on Davis when it assigned him to the gas station permit processing work. The record supports that regardless of how the District interpreted the medically-recommended work restrictions, the District assigned Davis

17

work that stayed within the parameters of Dr. Braun's recommendation that his fine manipulation activity be noncontinuous and not exceed 30 minutes per hour and four hours per day.

The record supports that Davis was not permanently incapacitated in light of the work accommodations provided to him, and Davis presented no evidence that refuted the District's evidence on this point as a matter of law. Accordingly, Davis cannot prevail on his claim that the evidence does not support the trial court's denial of his mandate petition.

## II. *Other Contentions of Error*

Davis argues his rights were violated because the hearing officer denied his counsel's request for a continuance to secure the testimony of the county's workers' compensation adjuster, Balvaneda. As set forth above, county adjustor Balvaneda issued two memos to the District: the first memo (dated March 5, 2009) referred to Dr. Braun's 30 minutes per hour/four hours per day maximum keyboarding recommendation, and the second memo (dated June 9, 2009) referred to Dr. Murphy's reference to the 25 percent loss of capacity. During the second day of the two-day administrative hearing, Davis's counsel requested a continuance so he could secure the attendance of Balvaneda, arguing that her testimony was relevant on the issue of how the District determined that Dr. Braun's work restrictions were no longer applicable.[12]

---

[12] Davis's counsel explained that he had mistakenly failed to subpoena Balvaneda before the administrative hearing.

18

When Davis's counsel first requested the continuance, he had the March 2009 memo from Balvaneda (referring to Dr. Braun's recommendation), but he did not have the June 2009 memo from Balvaneda (referencing Dr. Murphy's report). District personnel apparently relied on the second memo to establish the 25 percent accommodation in lieu of Dr. Braun's recommended accommodation. Davis's counsel argued that given that only the first memo had been produced, either the second memo should be produced by the District, or Balvaneda should testify to explain the change in the accommodation adopted by the District personnel. In response, the District's attorney told the court that the District had provided the second memo to Davis at a time when he was not represented by counsel, and the District's attorney then proffered the second memo for Davis's counsel's to now review. The trial court told Davis's counsel he could introduce the second memo into evidence, and denied his request for a continuance. In its mandate ruling, the trial court found no error on this point.

We review the denial of a continuance for abuse of discretion. (*Ring v. Smith* (1970) 5 Cal.App.3d 197, 201.) The trial court reasonably rejected Davis's challenge to the hearing officer's denial of the continuance. Davis has not presented any persuasive argument as to how testimony from Balvaneda might have been important to his case.

First, Balvaneda's second memo (which was entered into evidence) described Dr. Murphy's reference to Davis's 25 percent loss of capacity as constituting Davis's "permanent work restrictions"; the District personnel testified that this is the work restriction they believed was applicable and they interpreted it to mean a 25 percent reduction in fine manipulation; and there is no suggestion as to what further relevant

19

information might have been forthcoming had Balvaneda been called as a witness.

Second, the critical evidentiary factor that emerged during the administrative hearing was the District's evidence that *regardless of how the District viewed the doctors' recommendations*, it ultimately gave Davis a work assignment that complied with the parameters of Dr. Braun's recommendations. In short, it was not unreasonable to deny the continuance request given the receipt of Balvaneda's memo into evidence, and the narrowing of issues in a manner that diminished the relevancy of testimony concerning the dispute over the two doctors' recommendations.

To the extent Davis suggests on appeal that Balvaneda's testimony was important because the memos reflect that the District first decided to follow Dr. Braun's recommendations, and then decided not to do so based on racial prejudice, there is nothing in the record to support this theory. The record shows that Balvaneda's two memos simply reflect the District's serial receipt of two doctors' reports, first from Dr. Braun and then from Dr. Murphy. There was no abuse of discretion in the denial of the continuance to subpoena Balvaneda.

Finally, we reject Davis's suggestions that the actions were motivated by racial prejudice, and that the hearing officer was biased against him. We have reviewed the record and find no support for these contentions.

20

## DISPOSITION

The judgment is affirmed.  Appellant to pay respondent's costs on appeal.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.